1               UNITED STATES BANKRUPTCY COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3              (SAN FRANCISCO DIVISION)

4

5  In re:

6  HELLER EHRMAN, LLP,         Case No. 08-32514

7                          Chapter 11

8                          San Francisco,California
                              November 3, 2009

9                          1:31 p.m.
              Debtor.

10  _____/

11               TRANSCRIPT OF PROCEEDINGS
       MOTION FOR RECONSIDERATION OF ORDER APPROVING

12               BONHAMS' RETENTION

13
  BIGGERS, et al.,

14
         Plaintiffs,

15
    v.                 A.P. No. 09-3058

16
  HELLER EHRMAN, LLP, et al.,   **A PORTION OF THIS**

17                         **TRANSCRIPT IS UNDER SEAL**
         Defendants.

18  _____/

19
               TRANSCRIPT OF PROCEEDINGS

20     JOINT MOTION FOR (1) PRELIMINARY APPROVAL OF CLASS
      SETTLEMENT; (2) CERTIFYING CLASSES FOR SETTLEMENT;

21  (3) APPOINTING CLASS COUNSEL AND CLASS REPRESENTATIVES;
   (4) APPROVING FORM OF CLASS NOTICES; AND (5) SCHEDULING

22       FINAL HEARING ON APPROVAL OF SETTLEMENT

23      BEFORE THE HONORABLE DENNIS MONTALI
       UNITED STATES BANKRUPTCY JUDGE

24

25

```
 1  APPEARANCES:

 2
    For Heller Ehrman:        PACHULSKI, STANG, ZIEHL AND JONES
 3                            BY: JOHN D. FIERO, ESQ.
                                 KENNETH H. BROWN, ESQ.
 4                               MIRIAM KHATIBLOU, ESQ
                              150 California Street, 15th Floor
 5                            San Francisco, California 94111

 6                                        -and-

 7                            MANATT, PHELPS & PHILLIPS, LLP
                              BY: JOHN FOX, ESQ.
 8                               ALEXA L. MORGAN, ESQ.
                              1001 Page Mill Road, Building 2
 9                            Palo Alto, California 94304

10
    For the Creditors'        FELDERSTEIN, FITZGERALD, et al.
11  Committee:                BY: THOMAS A. WILLOUGHBY, ESQ.
                              400 Capitol Mall #1450
12                            Sacramento, California 95814

13

14
    For the Plaintiffs:       BLUM AND COLLINS, LLP
15                            BY: STEVEN A. BLUM, ESQ.
                              707 Wilshire Boulevard, 48th Floor
16                            Los Angeles, California 90017

17

18  Also Present:             DALE BRATTON, Creditor
                              DAVID SIMON, Creditor
19                            BONNIE MENICUCCI, Creditor
                              MARTIN GAMMON (Bonhams)
20

21

22

23

24

25
```

```
 1   APPEARANCES (CONTINUED):

 2

 3   Court Recorder:          JONEITA HAMMONDS
                              UNITED STATES BANKRUPTCY COURT
 4                            235 Pine Street
                              San Francisco, California 94104
 5

 6

     Transcription Service:   Jo McCall
 7                            Electronic Court
                              Recording/Transcribing
 8                            2868 E. Clifton Court
                              Gilbert, Arizona 85295
 9                            Telephone: (480)361-3790

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

November 3, 2009                                    1:31 p.m.

--—oOo—--

THE COURT: Good afternoon.  Please be seated.
Mr. Fiero, what do you think we should do, the Biggers
matter first or the Bonhams?  We've got a lot of people
here, probably mostly on Biggers, huh?

MR. FIERO: Probably mostly on Biggers, but I
think maybe Bonhams will take less time.

THE COURT: You think so, huh?

(Laughter.)

MR. FIERO: Well, perhaps that's wishful thinking.
Your Honor, we'll take them in any order you like.

THE COURT: Let's try to take care of the most
number of attorneys.

MR. FIERO: Okay.  So that puts Biggers first.

THE COURT: Yes.  Let me make a couple of comments
about Biggers.  First of all, my Clerk reminds me that
later this month on the 12th we have a status conference on
the case, and I see no reason to leave that on calendar; do
you?

MR. FIERO: None, Your Honor.  I think the Court
is fully apprised of the status of the case.

THE COURT: Well, if I approve the -- if I do the
preliminary approval, then the A.P. is just going to sit on

1  hold until we go to the final approval; isn't that true?

2          MR. FIERO: That's exactly right.

3          THE COURT: Yeah.  Okay.  Well then let's do this.

4  Do we have -- is class counsel in the court today?

5          MR. BLUM: Yes, Your Honor.

6          THE COURT: Okay.  I just wanted to get who was

7  here.  Well, let me get -- let's get appearances on the

8  Biggers matter then, so I'm not doing this in a haphazard

9  manner.  Mr. Bratton?

10          MR. BRATTON: I happen to be first in line, Your

11  Honor.  Dale Bratton, creditor, appearing on my own behalf.

12          MR. FOX: John Fox, Manatt, Phelps & Phillips,

13  representing Heller Ehrman.

14          THE COURT: Good afternoon, Mr. Fox.  Mr. Brown?

15          MR. BROWN: Good morning, Your Honor, Ken Brown of

16  Pachulski Stang representing Heller Herman.

17          MS. MORGAN: Alexa Morgan, Manatt, Phelps &

18  Phillips, representing Heller Ehrman.

19          THE COURT: Good afternoon.

20          MS. MENICUCCI: Bonnie Menicucci, unemployed

21  creditor.

22          THE COURT: Thank you.  Yes, sir.

23          MR. BLUM: Good afternoon, Your Honor, Steven Blum

24  of Blum Collins for the Plaintiff class.

25          MR. SIMON: Good afternoon, Your Honor, David

1  Simon appearing for myself as a creditor.

2        THE COURT: Okay, thank you. Mr. Simon.  Listen,

3  I've been through the comments on the notice that -- well,

4  the first set of comments that Mr. Bratton submitted, and

5  then I understand, Mr. Brown, the Debtor has agreed to some

6  of those.  Oh, Mr. Willoughby, You're on the phone, right.

7        MR. WILLOUGHBY: Yes, Your Honor, Tom Willoughby

8  of Felderstein, Fitzgerald, Willoughby on behalf of the

9  Creditors' Committee.

10       THE COURT: Okay.  Well, a couple of things.  As

11 you know, the Plan and Disclosure Statement are on the back

12 burner now and so -- but before that, I revisited with Mr.

13 Bratton and the other objectors' comments in mind, and Mr.

14 Brown, your arguments, and Mr. Collins, everyone's

15 discussion of the other day.  I went back and read the

16 agreement and reread the notice, and jotted down a lot of

17 thoughts and then of course I was asked to suspend the Plan

18 process, and so to some extent, some of my reactions that I

19 wanted to revisit are influenced by the change in schedule

20 on the Disclosure Statement.

21       And by the way, Mr. Fiero, before we adjourn

22 today, we have to talk about what to do about the

23 Disclosure Statement hearing.

24       So I wanted to -- and I didn't know that Mr.

25 Bratton was going to submit a mark-up, and so I went

1   through the notice again.  I went through some of the

2   issues that were presented.  I sort of thought through my

3   own thinking on it, but that in turn gave rise to a couple

4   more significant questions that I want to put to whomever I

5   put them to.

6          The first question, however, is, I don't think,

7   significant at all, and it has to do with what is perhaps

8   nothing more than a style point, but I'd like you principal

9   players on the Biggers matter to look at the settlement

10  agreement itself -- and I hope you have a copy nearby -- on

11  page 4, there is in paragraph (b), little b, 1(b) -- I'm

12  sorry, (i)(b), there's a term "Wage Priority Cap," and then

13  later in the same line, "Priority Wage Cap," and I don't

14  see priority wage cap as a defined term.  Now it may be

15  just a transposition of words, and the drafter meant the

16  same wage priority cap.  But if that's so, someone needs to

17  tell me that.  Anybody want to take credit for --

18         MR. BROWN: It's a transposition of words, Your

19  Honor.

20         THE COURT: That's all it is?

21         MR. BROWN: Yeah.

22         THE COURT: I'm not suggesting that --

23         MR. BROWN: It's just a transposition --

24         THE COURT: I mean that was what I suspected, but,

25  as you know, from other comments that I made, I get very

1  suspicious when I see capitalized terms.  So I'm not

2  suggesting that the agreement has to be modified.  I'll

3  leave that to the parties to the agreement.  I certainly

4  don't think it has to be done.

5         All right.  So that's out of the way.  Now,

6  here's the thing that I need some help from all of you.

7  Again, I'm going to try to address most, if not all of the

8  objections that were argued by Mr. Bratton and Mr. Simon

9  the other day.  But that is this.  When I –- and please

10 accept the fact that in my head, we were having the

11 Disclosure Statement on the 9th when I'm thinking this

12 through –- and I'm thinking about Mr. Willoughby, and I

13 guess Mr. Fiero's, your very bullish statements at the

14 hearing the other day that yes, there's a chance that

15 there's going to be a confirmed Plan by year end.  I guess

16 I don't think that's going to happen now.

17        But with the Plan in mind, I'm rereading the

18 Biggers settlement and reading the notice, and what gets

19 completely lost in the shuffle in my opinion, and frankly,

20 puts some substance to Mr. Bratton's argument about the

21 Plan and the Biggers settlement are joined at the hip, is

22 the procedure that's in the settlement agreement on page 7

23 called the "double track."  It's in the Plan.  If I –- I

24 didn't bring the Plan out here with me, but if I recall

25 correctly, in the Plan it says, if you're in the settlement

1  class and you don't want to wait, then do this other thing,
2  and you get your money earlier.  And that led me to the
3  conclusion, why in the world would anyone ever not do that.
4  In other words, if we had a confirmed Plan before Biggers
5  became final, why would anybody wait to get the very same
6  money.  Can you answer that?

7          MR. BROWN: I'm going to give you -- I'm not going
8  to answer it right away, because --

9          THE COURT: (Laughing.)  Okay.

10         MR. BROWN:  -- I think the question is moot.

11         THE COURT: I think so too.

12         MR. BROWN: And so I don't know that it requires
13  an answer.  It's a good question, and I think that probably
14  most people would have elected to be in the Plan, but I
15  don't think we can now say that there's going to be a
16  confirmed Plan before the Biggers settlement becomes final,
17  so that's --

18         THE COURT: I conceded that point in my opening
19  comments, but that's going to lead me to another question,
20  and Mr. Brown, I think you read the tea leaves the way I
21  do, but then the question is something that I touched on
22  the other day, why is the class action mechanism necessary
23  if you could accomplish in the Plan the same thing.  In
24  other words, if you said in the Plan, everybody who is in,
25  you know, class whatever it is can get his or her priority

1   wage, vacation, severance, and if you sign this general

2   release in favor of everybody else, you also get, you know,

3   an "X" amount of more money, and if you don't, you don't.

4   I mean it's an alternative treatment that is in the control

5   of the claimant, not the Debtor, and I resisted in the past

6   in other cases, Plans that don't let the creditor control

7   what he gets or she gets.

8           But if the Plan just said, if you want only your

9   wage and vacation, you got it.  If you'd like more, sign

10  this third-party release.  Now again, leaving aside

11  everything you said the other day about Rule 23 and

12  attorneys general and class counsel, why do we need any of

13  that mechanic if under no circumstances can anyone get paid

14  until there's a confirmed Plan?  And I'll make one other

15  comment before you answer it.

16          You gave me a bunch of other instances of class

17  action settlements, but in some of them, it's obvious the

18  payment is going to be made regardless of any Plan, and in

19  others, I couldn't tell.  So here we have -- so I can't

20  because of it -- you may know better than I from those

21  other cases what in fact is happening, but in our case, not

22  a single dollar goes out until we have a confirmed Plan.

23          MR. BROWN: I can take -- some of those cases I

24  provided to you were cases that I was involved in, and

25  there was money in the estate --

1    THE COURT: Right.

2    MR. BROWN:  -- sufficient to pay priority

3  claims --

4    THE COURT: And presumably they were going to be

5  paid --

6    MR. BROWN: We just allowed priority claims and

7  paid them --

8    THE COURT: And paid them.

9    MR. BROWN:  -- before a Plan was confirmed.

10    THE COURT: Even though in some jurisdictions, you

11  probably couldn't do that, but I'm not saying this is one;

12  I'm saying, as you know, that itself is a little bit of a

13  bankruptcy -- creative bankruptcy, right?  But that's not

14  our point.  It's not been proposed in this case.

15    MR. BROWN: That's correct.

16    THE COURT: And it won't be proposed, right?

17    MR. BROWN: I believe that -- we have to get

18  funding to pay the claims, and we don't currently have it.

19    THE COURT: Okay.  So again, I come back to this

20  whole thing.  I don't understand it -- why it's necessary,

21  and again, I don't mean that as a criticism of Mr. Blum or

22  Mr. Collins or of the people that have promoted it, but if

23  at the end of the day, every single person who could get

24  all the money under the Biggers settlement could get it

25  without the need to have the Biggers settlement, and those

1  that don't like the Biggers settlement and don't want to

2  release anybody can get what the priority would be entitled

3  to and they're free to litigate their WARN and their

4  waiting time penalty cases.  What are we accomplishing by

5  this mechanism?

6          MR. BROWN: Well, I think you make a good point,

7  but I think there are differences.  For example, what

8  happens to the class action?  We have the Biggers class

9  action; it's still pending, and, you know, we get --

10         THE COURT: Well, I'll say, what happens if the

11  Court won't certify the class?  You know, isn't that --

12  isn't the answer it dies?

13         MR. BROWN: Well, but --

14         THE COURT: I mean I'll let the class action

15  lawyers tell me out there in the real world, but this isn't

16  the real world; this is bankruptcy land, and we have this

17  problem.  So look, Mr. Brown, I don't know what happens to

18  it either, but my sense is it's unnecessary.

19         MR. BROWN: If we have a class action settlement,

20  we know what happens to the class action.  If the

21  settlement goes forward, there will be a final judgment

22  with prejudice dismissing the class action, and that has

23  legal import on all of the defendants, and I think --

24         THE COURT: Right, but if the Plan is confirmed.

25         MR. BROWN: Pardon me?

1             THE COURT: But only if the Plan is confirmed.

2             MR. BROWN: Well, but the Debtor could

3 theoretically waive that contingency.  It's a contingency

4 that, you know, it's a pre-condition, but it's waivable.  I

5 don't know that it would be, but that is a distinction.

6 You could, at least theoretically, and it happens all the

7 time, have a class action settlement under 7023 without

8 Plan confirmation.  This settlement agreement has Plan

9 confirmation as a contingency, but it's waivable.

10             THE COURT: Well, I understand that if we –- I

11 mean this gets back to comparing this one with the other

12 ones that you gave me, and one of the concerns I have if I

13 go forward with this is I still think the notice needs to

14 be a little more clear as to when you're likely to get

15 paid.  But you could, I guess, dispose of the class action

16 in its entirety by simply leaving people with a lot of

17 claims, but I guess until the Debtor is in a position –-

18 and this is perhaps more the Creditors' Committee –- if the

19 Creditors' Committee is willing to spend one dollar in

20 excess of the clear statutory priority amounts and ask me

21 to allow that to spent, then maybe you persuade me it's the

22 right thing to do.  The WARN act doesn't get priority,

23 right?

24             MR. BROWN: The WARN does get priority.

25             THE COURT: Well, but only if there's enough in

1  the cap.

2      MR. BROWN: If there's room, yes.

3      THE COURT: If there's room for it.

4      MR. BROWN: If there's room, it gets priority
5  after vacation.

6      THE COURT: So for some people -- well, even that
7  is -- is that absolutely clear as a matter of law?

8      MR. BROWN: Well, it's not clear in this Circuit,
9  Your Honor, because the Ninth Circuit has -- there have
10 been -- certainly -- you know, it's a complicated question.
11 BAPCPA changed the language in 503 and made many people
12 think that certain portions -- WARN claims that came --
13 that were attributable to a portion of the 60 days that
14 fell post-petition would be administrative claims.  There
15 are three Bankruptcy Courts that have ruled on that issue,
16 one from Arizona, one from Missouri, and then the Power
17 Mate decision in Delaware.  They have all said no, that's
18 not what the BAPCPA amendments mean, and that WARN claims
19 resulting from a pre-petition termination are priority to
20 the extent there's room on the cap and unsecured after
21 that.

22     THE COURT: Well, okay, but --

23     MR. BROWN: The only decisions on that are thus,
24 and that's how we are treating them in the settlement.

25     THE COURT: But I'll repeat the view, my view, if

Case: 09-03058   Doc# 51   Filed: 02/22/10   Entered: 02/22/10 14:53:25   Page 14 of
92

1 the Committee says please spend some of this estate money

2 for people who may or may not have priority, you know, then

3 we revisit it, but the Committee isn't at that point yet.

4 So okay, but what else?  I mean let's concede this point.

5 If everybody who is in a position to say so says, let's pay

6 out before this confirmation, then I'll grant you the class

7 action is a more conventional mechanism.  I'm still not

8 completely sure you need it, but that's okay; I'll give you

9 that point.  But what else?  But that's not our case.

10        MR. BROWN: Okay.  It's the shareholder release

11 issue, and, you know, without -- what we get with the

12 Biggers class action under 7023 is we get a final order

13 that is going to provide broad releases to the shareholders

14 and a judgment that will have that import as well, so that

15 is a necessary precursor to -- I mean I don't know -- we

16 had a mediation on Friday.  The bid and the ask between

17 what the Committee wants and what the shareholders have on

18 the table is disparate.

19        THE COURT: Just keep that in the Committee.

20 Don't go into it.

21        MR. BROWN: No, I'm not going to go into detail.

22 But a mediation is still alive, and is reconvening on

23 November 16th.  And without, you know, the Biggers

24 settlement kind of moving along with, you know, the kind of

25 carrot at the end of the stick for the shareholders, being

1  broad releases through a final order and a judgment,

2  they're not going to know they have complete peace when

3  they sign their checks -- when and if they sign their

4  checks -- as part of the mediation with the Committee,

5  because it's a different group over here that's chasing --

6          THE COURT: But they're not going to either as

7  long as you have a confidential threshold percentage break

8  point, right?

9          MR. BROWN: Again, but that's in the Debtor's

10 control.

11         THE COURT: Well, okay.  Look, let's suppose we go

12 to final judgment in Biggers, and for reasons that I won't

13 even speculate, we just don't get a confirmed Plan, and the

14 case goes to Chapter 7.  Are the shareholders released?

15         MR. BROWN: We don't have a confirmed Plan --

16         THE COURT: Right.  I mean, yeah, and --

17         MR. BROWN:  -- at that point, I guess the

18 Committee and the Debtor would have to determine whether or

19 not waiving Plan confirmation was advisable, and I think it

20 would be, you know, largely determined by whether or not

21 there was some source of funding, whether that was

22 shareholder contributions or whether there's some other

23 source of funding, and it is possible that another source

24 of funding other than shareholder contribution can be

25 generated to fund the priority portion of this settlement.

1    THE COURT: Well, sure, that's possible.  I agree,
2  it's possible.

3    MR. BROWN: So yeah, it's theoretically possible,
4  and I'm not -- I don't know what's going to happen, Your
5  Honor, but certainly, you know, it is intellectually honest
6  to say that it is possible, and I think there are reasons
7  to go forward with the class action settlement because
8  getting shareholder release is a necessary prerequisite to
9  getting shareholders to write a check as part of the
10 Committee claims against them based on, you know,
11 fraudulent transfers, Jewel, et cetera.

12    THE COURT: Well, the fraudulent transfer, Jewel
13 theories and any other variations are all honed by the
14 Debtor in Possession.

15    MR. BROWN: But controlled by the Committee.

16    THE COURT: Well, I understand, but the claims
17 that Mr. Bratton has and Mr. Simon has and the other 798
18 people, that's their own individual claims.

19    MR. BROWN: That's the point.

20    THE COURT: Yeah.

21    MR. BROWN: So I mean there's -- but in order to
22 get, you know, in order to get the shareholder
23 contribution, the shareholders have to know that they're
24 getting complete peace.  The only way they can have
25 complete peace is by settling the Biggers action and

1  getting the releases from, you know, the people that Blum

2  Collins represents.

3       THE COURT: Well, is that consistent with your

4  comments the other day when Mr. Bratton argued that the

5  shareholder settlement is implicated, and you said, it

6  doesn't matter.  We can go either way on this.  I mean I

7  thought the point you made was that funding -- it didn't

8  matter whether one shareholder agreed to the settlement or

9  249 shareholders did.  Isn't that what you said?

10      MR. BROWN: I don't recall that comment.  I don't

11 think the Biggers settlement -- I think the Biggers

12 settlement is important in terms of getting the

13 shareholders to contribute.

14      THE COURT: No, I understand that.

15      MR. BROWN:  The converse is not necessarily true,

16 which is the Biggers settlement is not necessarily

17 contingent on having the shareholders contribute.

18      THE COURT: Well, but that's almost circular,

19 because the Biggers settlement is meaningless if there's no

20 funding for the reasons you stated.  Now I realize that if

21 the Debtor knocks the bank off and collects 60 million

22 dollars next week, maybe you would have something else to

23 talk about.

24      MR. BROWN: That's right.  I mean there's --

25      THE COURT: You know, I'll sell you a bridge -- we

1 had an extra one for sale last week, but we're down to one

2 this week, the Brooklyn Bridge.

3        MR. BROWN: I think we were all kind of

4 operating -- the operating assumption was that the most

5 likely source for funding the priority portion of the

6 Biggers settlement was the shareholder --

7        THE COURT: Yeah.

8        MR. BROWN: And perhaps, you know -- Mr.

9 Willoughby, I hate to do this to you, but I know you have

10 some thoughts perhaps about -- you may have some thoughts

11 about alternate sources of funding.  Is it appropriate for

12 you to discuss those?

13        MR. WILLOUGHBY: Yes, Your Honor.  Yes, Mr. Brown.

14 Your Honor, we actually have -- and we are drawing it up --

15 at least six or seven different possible sources of funding

16 ranging from special receivables to other causes of action

17 that the Committee has been investigating to, you know,

18 potential loans.  There's kind of a multitude of areas that

19 we could do to try to -- to provide the funding to do two

20 things.  This is really to get the employees paid their

21 priority claims, exit the Chapter 11, and, you know -- and

22 I think there's also what is possibly -- the most likely

23 scenario is if the mediation process doesn't result in an

24 overall deal with a great bulk of the shareholders, which

25 is possible, that we're still going to go out with a number

1    that we believe is going to be very reasonable, and that

2    some portion of the shareholders are going to accept

3    anyway.

4          THE COURT: Okay.  But do you see any set of

5    facts, Mr. Willoughby, that has the Biggers class being --

6    and I use the word "class" with a small "c," that the

7    people in the Biggers class getting any money before we

8    have a confirmed Plan?

9          MR. WILLOUGHBY: I find that unlikely because I

10   tend to, you know, view, you know, payment of priority

11   claims should be done through a Plan.

12         THE COURT: Well, I mean I think in a -- and as

13   you will all recall, and I know, Mr. Brown, I think in your

14   prior life, you were involved very intimately in the

15   Robbins case, and the Robbins case was a horrible instance

16   of priority claims that should have been paid, and the

17   Court of Appeal, as I recall, wouldn't permit it to be paid

18   in the Plan.  If we had something like that, and there was

19   an individual -- or there was an individual situation or

20   set of circumstances that compelled payment and there was

21   no opposition, then that's a different story.  But I think

22   what you're saying, Mr. Willoughby, is pretty much what I'm

23   saying is, okay, fine, whether you fund it with

24   shareholders or loans or win the lottery, it's still going

25   to be a confirmed Plan before you get any money out, which

1 | gets back to then, why do we need a cumbersome class
2 | action?
3 |         MR. WILLOUGHBY: Well, Your Honor, can I address
4 | that real quick, that second point?
5 |         THE COURT: Huh?  What?
6 |         MR. WILLOUGHBY: Can I address your second point
7 | there?
8 |         THE COURT: Sure.
9 |         MR. WILLOUGHBY: I believe that just from probably
10 | your experience, my experience, all the Pachulski lawyers'
11 | experience, getting actual responses back from large groups
12 | of employees, creditors, you get a very small number back.
13 | I cannot imagine a circumstance -- I just find it very
14 | doubtful that if you have seven or eight hundred employees,
15 | that you would get a sufficient number of actual active
16 | responses back.  And that's the whole point for the class
17 | action process is that you can bind people that simply
18 | don't opt out.
19 |         THE COURT: Well, what you're saying is that
20 | people who worked at Heller, if they get a notice,
21 | admittedly it's a big long document that says, you know,
22 | look at Exhibit A, employee Willoughby, you are going to
23 | get $5,000 for your wages and your vacation.  If you would
24 | like 5,000 more dollars for WARN claims, sign the attached
25 | form.  And you say a large majority of people aren't going

1  to send that form back?

2           MR. WILLOUGHBY: Absolutely they will not.

3           THE COURT: Well then they left 5,000 bucks on the

4  table; haven't they?

5           MR. WILLOUGHBY: And then we're in a situation

6  where we're litigating with 50, 60, 70 percent of the

7  people and dealing with them on a one-time basis, and it's

8  incredibly inefficient to --

9           THE COURT: Well I guess I don't share your view

10 that you make it that simple to get a big check back, that

11 everybody is going to ignore it and what you want to do is

12 reward the silent majority by just sending them that extra

13 $5,000.  Well, let me -- look, look, let's hold this point.

14 I'm -- yes, Mr. Bratton, do you want to comment on this?

15           MR. BRATTON: Do you prefer that I stand or sit?

16           THE COURT: I don't care.  Just stay near a

17 microphone.

18           MR. BRATTON: It'll be a little quicker if I sit,

19 I think.  I would like to address the point that's under

20 discussion, which is, how does this relate to the Plan

21 process, because we had an order yesterday telling us that

22 the November 9th hearing is vacated.  The order also states

23 that there will be a revised Plan and Disclosure Statement

24 subsequently submitted.

25           THE COURT: Well, I mean I'm assuming there will

1  be.  If we never see another Plan, I suppose there's only

2  one alternative, but --

3        MR. BRATTON: Well, that's even better for my

4  argument, which is that there is no Plan before us right

5  here today, that is the one that's contingent on this

6  settlement agreement that they want you to preliminarily

7  approve.  You have a huge illusory hole in the Biggers

8  settlement that they want you to send out for approval.

9  It's contingent on a Plan.  The Plan is being pulled back.

10 It's contingent on a process.  They don't know how it's

11 going to work.  It's contingent on the shareholder

12 agreement.  They don't tell us how much money they have to

13 get in.  It is joined at the hip, and the hip is broken.

14        THE COURT: Well, listen, you're re-arguing your

15 case, and I'm trying --

16        MR. BRATTON: No, all I'm saying is --

17        THE COURT: -- I'm trying to refine, sharpen the

18 pencil on the points.

19        MR. BRATTON: Yes, and I'm trying to be more

20 refined as well.

21        THE COURT: Okay.

22        MR. BRATTON: It is even clearer as we have this

23 discussion, that it's joined at the hip and the hip is

24 broken.

25        THE COURT: Well, see, I don't -- I think the

1  metaphor is a great one, but it doesn't work.  I think what
2  Mr. Willoughby is saying and Mr. Brown is almost forced to
3  concede, is it's extremely unlikely that there will be any
4  payment to anybody -- anybody in the Biggers class or not
5  before we have a confirmed Plan, assuming that the Debtor
6  stays in Chapter 11.  And that's what you call joined at
7  the hip.  I would put it more as confirmation of a Plan is
8  a sine qua non or quid pro quo, getting any money out the
9  door.

10          I'm willing to accept the counsel's
11  representations and arguments that maybe there are
12  alternative sources of funding, and it doesn't have to be
13  key to the shareholder settlement.  But let me run through
14  some other points, and then I'll -- I want to dispose of a
15  couple of things where I've essentially made a decision,
16  and there's a little bit of disorder here just because of
17  the way these things have come out.  I do believe that -- I
18  disagree with Mr. Bratton.  I think there's been an
19  adequate showing under the A & C Properties case, and so to
20  the extent that he objects that even on a preliminary
21  basis, there hasn't been adequate showing under the A & C
22  standards for a Rule 9019 settlement, I think that the
23  proponents have carried the day.  That of course could be
24  revisited on a final hearing.

25          Mr. Simon impressed me with his concerns about a

1  lack of clarity.  However as I went back and read it again,

2  and thought more about it and saw some suggested changes to

3  the notice, I'm satisfied that we're at an adequate clarity

4  point.

5      On Mr. Bratton's concerns about the seal of

6  lists, I'm going to stick with the Debtor's recommendation,

7  unless of course, Mr. Brown, unless the Debtor has conceded

8  the point.  But I'm persuaded in my mind that making the

9  list of the claimants available but not their dollar

10  amounts and making the threshold percentage number remain

11  under seal is not unreasonable.

12      I was concerned very much, as you recall from the

13  discussions the other day about opt out versus opt in.  I'm

14  still concerned about it, but I'm persuaded by seeing

15  what's been done in several other cases that it's not

16  completely unreasonable.  I'm going to have a couple

17  more -- I mean assuming I don't just say no on the whole

18  deal -- I'm going to require a little more explanation in

19  the notice and fair warning about opt in versus opt out.

20      I couldn't agree with Mr. Bratton the other day

21  when he made the argument that on its face the Plan was not

22  confirmable, and there were two reasons why I couldn't

23  agree with him.  One is, I had pointed out some of the very

24  things Mr. Brad Hewitt (Phonetic) commented on about the

25  discharge and so on, but now that's off the table for the

1  moment, and you heard counsel say the other day, I think,

2  who was at that hearing, that many of my comments were

3  going to be dealt with in the next iteration of the Plan,

4  and if there's some belief that there can be a discharge,

5  and the proponents of the Plan persuade me that that's

6  permissible, then so be it.  But I'm not going to -- I'm

7  not going to kill the Biggers class settlement process

8  because I can state to the world there is an unconfirmable

9  Plan in the court's file.

10        As a practical matter, there isn't any Plan in

11  the court's file.  As a legal matter, of course, there is

12  one, but at least at the moment, it's not on the active

13  docket if you will.  And no matter what happens at the

14  mediation, whether the mediation ends successfully or

15  unsuccessfully, the Plan that was filed a few weeks ago is

16  going to be modified.

17        And I think, Mr. Bratton, to the extent that you

18  raise questions about whether the bank -- any resolution of

19  the litigation with Bank of America was relevant, I think

20  that that's been dealt with, and it's not.  I think the

21  substantive -- the two substantive points that I remain

22  concerned about are the following.  The first one -- well,

23  I alluded to it.  You have to dig into the settlement

24  agreement on page 7 to find this double track or read it in

25  the Plan, but you can't find it in the notice.  I mean I

1  don't see anything in the class action notice that gives

2  the reader a clue that, by the way, if we confirm a Plan,

3  here's how you get your money earlier.  Now I don't know

4  what to do.

5          You told me that 90 days is running.  I think Mr.

6  Fox or one of you made the point the other day, oh, we've

7  got to meet this December 2nd deadline.  Realistically, I

8  don't know that that's doable, but if the proponents of the

9  Plan –- how can I say this –- if there's a possibility of a

10 so-called double track treatment, then I think that it's

11 got to get reconciled in the notice.  If realistically it

12 ain't going to happen and that there's no way anybody will

13 have such a double track option, then I think the

14 settlement agreement has to get modified.  You know, that

15 probably the more realistic approach.

16         MR. BROWN: I mean, Your Honor, things have moved

17 very fast, but as, you know, between the last time we were

18 here, which was Thursday, and then the events of Friday,

19 and today I had the exact same thought, you know, which is,

20 it probably doesn't make sense to have –- to double track

21 the settlement with the Plan.

22         THE COURT: Okay.

23         MR. BROWN: And I think what we prefer to do –-

24 but again, I'm kind of thinking out loud which is probably

25 a bad idea to do in court –-

1          THE COURT: I do it all the time.

2          MR. BROWN:  -- but I think what we would prefer

3    to do is have the 7023 settlement process running, because

4    even with the Class Action Fairness Act notice, we can have

5    a hearing some time in mid -- you know, mid to late

6    January, probably before any Plan -- well before any Plan

7    is going to be confirmed.

8          THE COURT: As the guy who's standing up there for

9    all of your colleagues and pressing for the Biggers

10   settlement, your best ally was Judge Newsome when he asked

11   me to cancel the Disclosure Statement hearing, and I don't

12   think he even realized he was doing that.  The next

13   question, though, is something that I need perhaps Mr. Blum

14   to help me on.  I don't understand how the first chunk of

15   the attorney's fees is earned and so the question that I

16   need, and maybe I'm just missing it in the agreement is

17   this, if -- it sounded to me like if 75 percent of the

18   members of the class remain in, then $700,000 of fees are

19   owed -- or earned, excuse me, and I don't know if that's

20   what happens or if even the fees are at risk if there's

21   never a confirmed Plan, and then we get back to, well, why

22   wouldn't everybody at least take the priority portion of

23   the payments.  I mean again, it seems to me it's an

24   automatic -- how can I say this -- you'd have to have no

25   more than -- you have to have 76 -- sorry -- 26 percent of

1  the people opt out before that 75 percent, $700,000 fee
2  threshold was met.  Isn't that correct?  I mean I know I've
3  confused it the way I asked the question.
4        So let me restate the question.  Mr. Brown, how
5  does Mr. Blum earn the $700,000?  He can't miss; can he?
6        MR. BROWN: Yes, he can.
7        THE COURT: I mean it's a done deal.
8        MR. BROWN: He can miss --
9        THE COURT: How?
10       MR. BROWN:  -- if more -- if 26 percent opt out.
11       THE COURT: Right.
12       MR. BROWN: Either don't -- either they opt out
13  and don't participate --
14       THE COURT: No, if they opt --
15       MR. BROWN: The 75 is cumulative if we have a
16  double track.  So it counts people --
17       THE COURT: Well but we don't have a double.  We
18  just killed the double track.
19       MR. BROWN: If 26 percent of the people opt out
20  and say I want to fight about WARN, and I want to fight
21  about my waiting time penalties.
22       THE COURT: All right.  Then there's no secret
23  there.  The deal is dead; isn't it, or is it?  What happens
24  to the other 74 percent, assuming that the Debtor says I
25  want to go with this deal.  Do they still get --

1    MR. BROWN: Well, I think at that point, we're

2  talking about a class action settlement that would -- to

3  the extent and to the extent it exceeds the blow tradition,

4  then the Debtor doesn't have to go forward with the

5  settlement.

6    THE COURT: No, no, I understand that, but --

7  okay.  But what if at least 75 percent stay in the deal and

8  then there's no Plan; the case goes to Chapter 7.  Does he

9  get his fee?

10    MR. BROWN: No.

11    MR. FOX: There have to be funds as well, Your

12  Honor.

13    MR. BROWN: There would have to be a Plan

14  approved.

15    THE COURT: Yes, sir.  Since we've picked on you,

16  Mr. Blum.

17    MR. BLUM: Join the club.

18    THE COURT: Yeah.

19    MR. BLUM: Okay.  Well --

20    THE COURT: We lost you in the Bankruptcy Court.

21    MR. BLUM: Yeah.  As a visitor to bankruptcy land,

22  I may not understand the process completely, but I do

23  understand how class actions work, and I understand how --

24  I believe how the fee works and I believe I understand what

25  would happen to the class action if --

1       (The following few moments of dialogue have been

2   sealed and are not transcribed.)

3           THE COURT: Don't look at me fellas.  Mr. Blum, do

4   you want to have a moment to talk to counsel over there?

5       (Pause.)

6           MR. BLUM: Or whatever percentage it may be.  If

7   there's -- if the settlement blows up, it blows up, and,

8   you know, we try again.  You know, it just means that there

9   are too many people that want to --

10          THE COURT: Well, look, just help me on this one,

11  and I understand that you do class actions elsewhere, but

12  here it's bankruptcy and in this bankruptcy, unlike the

13  other ones that I was told about, the Plan is still the

14  quid pro quo.  So let's say 76 percent are in the deal, and

15  then the Plan is never confirmed.  Do you believe you've

16  earned your fee or not?

17          MR. BLUM: Well, I would think so.  I would hope

18  so, but --

19          THE COURT: That's contrary to what they just

20  said.

21          MR. BLUM:  -- we would make a fee application at

22  the appropriate time, if there is final approval.  If

23  there's no final approval of the settlement, of the class

24  action settlement, then, you know, there's no fee at that

25  time, and we just try again.

1        MR. BROWN: We ought to clear this up, Your Honor.

2   I mean there is no agreement, nothing in the agreement is

3   valid, including the attorney's fees provision if there's

4   not a Plan.  If you go back to the first operative

5   paragraph of the Plan -- of the agreement -- it said it's

6   contingent on Plan confirmation.  If a pre-condition of the

7   agreement does not occur, there is no agreement.  Paragraph

8   9 is part of the agreement.  So if there's no Plan, there's

9   no agreement, and if there's no agreement, there's no

10  attorney's fees.

11       THE COURT: Well, you know, I wasn't sure of that.

12  Let me look at the language.  I'm looking at paragraph 9.

13  Yeah, at least 75 percent of the plaintiff members timely

14  participate in the Plan or do not opt out of the settlement

15  and funds are available to allow to pay, so it's the "and

16  funds."  It's the "and funds."  That's the funding aspect.

17       MR. BROWN: Yeah, I mean I don't even think -- you

18  know, my point is that you don't even -- it's not from

19  paragraph 9.  Paragraph 9 is not operative, and none of the

20  settlement is operative unless there's a Plan confirmed.

21       THE COURT: Well, but that -- but so Mr. Blum says

22  he believes that if he gets the requisite percentages, he's

23  earned his fee and he'll apply for it, and if there's no

24  Plan -- I mean we all -- I mean I'd like to think, and I

25  presume most of you think there's likely to be a Plan, but

1 we can't say for sure there's going to be a Plan, right?

2 And -- right, Mr. Willoughby?

3          MR. WILLOUGHBY: That's correct, Your Honor.

4          THE COURT: So -- I mean I'm not saying Mr. Blum

5 can't have his fee or at least apply for it.  I'm not

6 prejudging that.  It's that it wasn't clear to me because

7 that's why I raised the question.  Well, Mr. Blum, it seems

8 to me that what you're hearing the Debtor's counsel say and

9 the Committee counsel say is, your fees per the deal, at

10 least the 700,000 is 75 percent in and funded.  If you

11 believe that you're entitled to the fees even if it's not

12 funded, I think you can apply for them or maybe you want to

13 clarify it with them as to what your rights are.  But to

14 me, it sounds to me like your interpretation is different

15 from their interpretation, at least at this point.

16          MR. BLUM: I would anticipate making a fee

17 application at the appropriate time, consistent with the

18 settlement agreement and establishing to the Court the work

19 that has been done to achieve the settlement and to provide

20 value to the class members.

21          THE COURT: But you weren't here the other day,

22 and you heard there was an argument made I think by Mr.

23 Simon that a large chunk of the money is money that

24 everybody gets regardless.  Even the opt-outs get all but

25 the WARN Act portion, and he was polite and didn't object

1  to your fees because there's nothing to object to, but he

2  was saying, why are you getting paid all this money for

3  getting people what the law already gave them.  And that's

4  the issue.  I mean that's what his concern was; that's what

5  prompted me to go back and reread this to try to understand

6  it, and I'm a little confused by it, frankly.

7         MR. BLUM: My understanding is that the Debtor

8  contests WARN Act payments.

9         THE COURT: Yeah.  No, I understand.

10        MR. BLUM: And that those who do not –- those who

11  opt out of the settlement and refuse to provide releases

12  with regard to WARN Act liability will not receive WARN Act

13  money.  It's my understanding that Heller has, as it must,

14  admitted that it owes vacation pay.  It's our belief that

15  this vacation pay would not be paid out in the near term,

16  but would instead be paid out in the long term, had it not

17  been for the work of class counsel.

18        THE COURT:  But I don't think that's accurate

19  because in a Chapter 11, to get out of Chapter 11, they

20  have to pay priority claims.  I mean there's some

21  provisions for stretching it out a small amount of time,

22  but generally they get paid.  And if you look at page 11 of

23  the settlement agreement, the table, the same table that's

24  in the notice, there's four and a half million bucks of

25  priority claim that gets paid no matter what.  I'm sorry.

1  I'm sorry, three million -- a little under 3,100,000,

2  vacation and bonus wages.

3          MR. BLUM: With regard to vacation, I understand

4  that it's because of our settlement that tax withholding is

5  at the Debtor's expense, whereas in some cases, it's not.

6  I understand that.

7          THE COURT: No.  I'm not concerned about that.  My

8  point is -- I don't think you follow me.  If you look at

9  page 11, there's a row that lists four and a half million

10  dollars that's going to be paid out in priority, three

11  million vacation, seventy thousand bonuses, a million-five

12  WARN.  The million-five WARN is what the settlement puts in

13  there that wasn't in there as a matter of undisputed law.

14  The Debtor had no -- and as I understand it -- no dispute

15  with the vacation and bonus amounts.  Is that a fair

16  statement?

17          MR. BROWN: That is true, Your Honor.

18          THE COURT: So in other words -- again, I don't

19  want to turn this into a contested fee application, but I

20  think what the argument was, is why does Mr. Blum get all

21  this money when half of the dollars going through the

22  Biggers settlement are there courtesy of the Congress.

23          MR. BLUM: Well, Congress provides rights to

24  plaintiffs in many cases, and frequently it's the lawyers

25  who have to enforce those rights --

1          THE COURT: No, I understand.  I understand.

2          MR. BLUM:  -- and make sure that the money gets

3   delivered on a timely basis, and I think that we can

4   discuss these things perhaps in a more informed way when we

5   make our fee application and provide the declarations and

6   history behind the settlement process.

7          THE COURT: Okay.  But I need to go to the more

8   important point and maybe you can answer it or maybe Mr.

9   Brown can answer it, and that's paragraph 10 of the

10  settlement agreement.  It seems to me that the 250,000

11  additional amount is an automatic if the deal becomes

12  effective.  In other words, what's the difference between

13  9(a) and (b) and 10?  What am I missing?  If he gets -- if

14  at least 75 percent are in, and the secret number isn't

15  reached, it's -- the full fee is earned; isn't it, under

16  this agreement?

17         MR. BROWN: If at least 75 are in under 9 and a

18  Plan is confirmed, they get the 700.

19         THE COURT: Yeah.

20         MR. BROWN: And then the additional 250 is if the

21  opt-out percentage --

22         THE COURT: If you don't pull the pin, and if you

23  pull the pin --

24         MR. BROWN: -- if the opt-out percentage isn't

25  exceeded or we don't pull the pin.

1          THE COURT: But, Mr. Brown, if you pull the pin,

2   then 9 is inoperative also.

3          MR. BROWN: Correct.

4          THE COURT: So I mean, my point is, there's no

5   difference.  It's a $950,000 fee unless the deal craters.

6   And I don't care if that's the deal you negotiated, but

7   let's not pretend it's two different things.  It's one

8   thing.

9          MR. BROWN: Well, couldn't it -- I think it could

10  be 700 if 75 percent of the class participates, and we

11  don't pull the pin.

12         MR. FOX: And, Your Honor, if I --

13         THE COURT: Well then why wouldn't that trigger

14  the other 200?

15         MR. BROWN: Because --

16         THE COURT: Mr. Fox, do you know?  To me, it's the

17  same.  I read these things over and over.

18         MR. FOX: No, Your Honor.  Mr. Brown had it

19  exactly right.  We thought that there would be a condition

20  that was possible that 75 percent, as paragraph 9 says,

21  approved, but not the full blow-out number.

22         THE COURT: Right.

23         MR. FOX: And we wanted to reward the efforts that

24  we understood would be forthcoming from Plaintiff's counsel

25  to spend a lot of time and energy to beat the bushes.  I

1   agree with Mr. Willoughby very much that it's very

2   difficult to get employees to come forward and show

3   interest, even when there's a lot of money on the table, as

4   we have here. And so we knew that they were going to have

5   to spend a lot of time at Blum and Collins post-settlement,

6   trying to sell this in. There's a lot of people; there's a

7   lot of questions; there's a lot of smart people with very

8   poignant questions, and they were going to have to spend a

9   lot of time, so that's what that $250,000 reward is.

10         THE COURT: But, Mr. Fox, I'm not here to quarrel

11   on whether he should get 950 or 7 or some other number.

12   I'm saying the difference between 7 and 950 is illusory

13   into this agreement. He gets all of it or none of it under

14   the agreement, as I see it, unless I'm misreading it.

15         MR. FOX: Well, that's why I want to go back to

16   your earlier question and see if I could relieve your

17   apprehension about the interplay of paragraph 1 on page 7

18   and 8, and I would direct your attention specifically to

19   1(d) as in dog, on page 8. That calls for the entry of a

20   final order confirming the Debtor's Plan as a pre-condition

21   of the settlement.

22         THE COURT: Right.

23         MR. FOX: There's a second trigger though, on the

24   attorney's fees provision, in 9(b) as in boy, on page 13,

25   that we pay the attorney's fees if there's funds available.

1  So the Debtor has the opportunity to pay from whatever

2  funds might be available, as Mr. Willoughby was outlining

3  earlier.  So if we've got funds, we'll pay the fees, and if

4  the Debtor, either because of the conditions of this

5  agreement are met, or because it exercises its discretion

6  to go forward with the agreement.

7          THE COURT: But you're not answering my question.

8  Let's assume there are funds available.  Willoughby bets on

9  the lottery and wins it.

10          MR. FOX: Okay.

11          THE COURT: And then he knocks off the Bank of

12  America and they hand him 60 million bucks next week and

13  kiss it and waive their claim.  So they're flush with cash,

14  and let's suppose that 75 percent and one more class member

15  says, count me in.  And then let's suppose that the Debtor

16  does not pull the pin on the hand grenade and says, good,

17  we'll go with this.  Mr. Fox -- I mean Mr. Blum, under this

18  agreement, gets 950, right?

19          MR. FOX: I think that's right, Your Honor.

20          THE COURT: Okay.  Now under what set of facts

21  could he only get 700 under this agreement?

22          MR. FOX: He gets 700 if we go forward with the

23  agreement.

24          THE COURT: Yeah.  And fund it.

25          MR. FOX: And it's funded.

1          THE COURT: Exactly my hypothetical. Same.
2  There's no difference.

3          MR. FOX: But we exercise our discretion --

4          THE COURT: Well, folks, I don't see a difference
5  between the two.  Mr. Brown, am I missing it?

6          MR. BROWN: Yeah, I'm looking at this now again,
7  and, you know, I think if there was a dual route to
8  settlement, if you had a Plan and you had 75 -- let's say
9  that you just had 75 percent participate through the Plan.
10  Everybody else -- let's say everybody opted out of the
11  Biggers settlement, but you had 75 percent participate in
12  the Plan.  Okay?

13          THE COURT: Well that's obvious.  Everybody is
14  going to participate in the Plan because you've scheduled
15  them.

16          MR. BROWN: No, participate in the Plan by signing
17  the release and, you know, taking advantage of the WARN
18  claim and waiting time penalty.  So you have opt in to 75
19  percent of the Plan.  Then there's only a $700,000 fee.

20          THE COURT: Well --

21          MR. BROWN: I mean I think that really is it.
22  It's if you have -- if you have people opt in to the Plan
23  vehicle at the 75 percent or above level, that you don't
24  get to the opt-out, you know, the blow-out percentage, you
25  can have the $700,000 fee.  Right?  I think that's right.

1          THE COURT: Well, if it took five of us to have a

2    half an hour discussion, and Mr. Bratton and Mr. Simon are

3    right, it's confusing, and it's confusing to me and it's

4    got to get revisited because -- for the reasons we stated

5    before.

6          MR. BROWN: I think a lot of the confusion will

7    fall out if we do away with the dual track, frankly.

8          THE COURT: I think so.  I think so.  Okay.  Let

9    me -- let me raise a couple of other points, and they go --

10   I'm going to look at the -- I'm going to look at the notice,

11   not the notice -- the revised notice that you all prepared

12   before we received Mr. Bratton's comments, and if you can

13   follow me.  Do you happen to have that one there?  I'm

14   assuming -- I'm assuming the following.  Let me stop and

15   think for a minute.

16         MR. BROWN: May I ask a question, Your Honor, if I

17   may.  The notice you're now referring to is pre-comments

18   from Mr. Bratton, so it would have been the one that I sent,

19   the last one I sent yesterday.

20         THE COURT: Yes.

21         MR. BROWN: Okay.

22         THE COURT: Yes.  And that's not to say that I

23   ignored Mr. Bratton's comments; it's that I marked up the

24   version before I got Mr. Bratton's comments.

25         MR. BROWN: I understand.

1        THE COURT: And some of his comments I've already

2   said I'm not going to support, like the disclosures of the

3   schedules.  But some of them I think are well taken, and you

4   agree are well taken.  But let me just stop and think for a

5   minute.  I think one of the overriding problems that I have

6   with the notice is, it, unlike the other cases that you gave

7   me that say you're going to get paid on such and such a day,

8   this is not clear on when you're going to get paid, and I

9   think this notice has to say at this point, if the

10  settlement is approved -- these are not magic words but the

11  concept has to be clear -- if the settlement is approved,

12  you who are in it, you non-opt-outers, you will have an

13  allowed claim in the amount per your schedule.

14        But then it's got to say, by the way, you will get

15  paid when the Debtor confirms its Plan, and at the moment,

16  we can't well you when that will be.  Now, conceptually, do

17  you have a problem with that, Mr. Brown?  It's true.

18        MR. BROWN: No, I do not, Your Honor.

19        THE COURT: Okay.

20        MR. BROWN: I agree with you.

21        THE COURT: Okay.  Then -- now, I told you that I

22  was concerned about opt out versus opt in.  I'm still -- I

23  already told you, I'm going to give it to you because you

24  persuaded me that it's not unreasonable, but on page --

25  well, yeah, page 2 of your revised notice, down at line 23,

1    the statement is made -- this is referring to opt-outs.

2              "However, you will still be entitled to receive

3              distributions on any claims for accrued, vested,

4              and unused vacation and unpaid wages to the extent

5              these claims are listed on the Debtor's schedules

6              and are undisputed."

7              I think you've got to say "or higher, if you have

8    an allowed claim." I mean you told you've gone through it,

9    and it's not likely --

10             MR. BROWN: Your Honor, I just want to make sure I

11   understand. I wasn't following the Court. It's:

12             "However, you will be entitled to receive

13             distributions on any claims for accrued..."

14   Blah-blah-blah. And then what do you want to say in

15   addition to that?

16             THE COURT: I want to track and be faithful to the

17   statute and the rules. If our employee -- if Mr. Bratton is

18   scheduled at 10,000, and he's filed a claim for 12,000,

19   that's an allowed claim unless it's objected to. And so

20   you've got to say in this language, you get paid to the

21   extent you're listed in the schedules or undisputed, or

22   larger if you have an allowed claim in that amount, some

23   words -- I'll leave to you the words. What I'm resisting

24   stubbornly is, you cannot lock people into the scheduled

25   amount when the law gives them the benefit of the allowed

1    claim amount.

2          MR. BROWN: Okay.  Let me understand.  If -- this

3    is only if you opt out, though.

4          THE COURT: Correct.

5          MR. BROWN: Okay.

6          THE COURT: Yes, I'm prepared to go with you and

7    word it such, if you opt in or you remain in, then you've in

8    effect trumped your own -- any larger Proof of Claim.

9          MR. BROWN: Okay.  I understand that.

10         THE COURT: So I'm going to --

11         MR. BROWN: So if larger -- if you have an

12   allowed -- if you end up with an allowed claim.

13         THE COURT: I'm not going to turn this into a

14   drafting session.  Conceptually, that's where I think it's

15   got to start the show.  Then I think -- there's a bit of

16   redundancy here, but it's the price of convincing me to go

17   with the opt-out.  I think right here, perhaps in bold,

18   we've got to get something like, if you do not opt out, any

19   Proof of Claim you have filed for wages, vacation, et

20   cetera, will be subject to disallowance and the claims will

21   be treated pursuant to the settlement.  In other words, I

22   expressed the other day my reluctance to abrogate the

23   traditional claims objection process, so I'm willing to let

24   you do it if it's clear, in bold, that says, if you stay in

25   the class, if you don't opt out, and any Proof of Claim you

1  filed is superseded or subject to being disallowed, then you
2  get what we say you're getting.
3        MR. BROWN: Your Honor, we have said that multiple
4  times in this agreement, in this notice, and we're happy to
5  say it again.
6        THE COURT: One more time, in bold, up front.  Now,
7  am I correct in this that every person -- I think you call
8  it schedule -- Exhibit 1.  Exhibit 1 will be per employee
9  line by line, the data that's in this field, Exhibit A, and
10  I have my sealed copy of it, so I'm not going to spread on
11  the record any of the confidences that are in there, but if
12  I look -- well, you know what it looks like.  It's a
13  spreadsheet, and so each person will have his or her data
14  with each of those items in there, right?  Mr. Fox, you're
15  nodding --
16        MR. FOX: That's correct, Your Honor.  We
17  anticipate just replicating that row exactly as you see it.
18        THE COURT: Okay.  Now, go to page -- I can't see
19  the page numbers -- page 7 of the notice under the heading,
20  "Terms of the Settlement."  Are you there, Mr. Brown?
21        MR. BROWN: Yes.
22        THE COURT: Actually go up -- just above "Terms of
23  the Settlement."  It says:
24        "You may secure a copy of the complete settlement
25        from plaintiff counsel at the address..."

1  I'd like you to add, "and it's also available on the

2  electronic docket at Docket No. such and such, whatever it

3  is, Docket -- you know, Exhibit A to the declaration of -- I

4  think it's your declaration, wherever it is, just -- but

5  it's going to be revised; isn't it?  It's probably going to

6  be revised, now that we talk about it.

7           MR. BROWN: The settlement agreement?

8           THE COURT: Yeah, because it's double track.

9           MR. BROWN: I think it is, subject, you know, I

10  mean there's a number of constituents that I think I need to

11  get a nod from, but subject to that, yeah, I think --

12           THE COURT: But it's the double track problem.

13           MR. BROWN: The double track problem.

14           THE COURT: Yeah, the double track problem has got

15  to be solved.  And I do want you to try again to clarify

16  what is the attorney's fee trigger.  I'm not going to have

17  another hearing to debate the drafting of it, but I want

18  that document to be accessible through the court's docket.

19  That's not to say that Mr. Blum can't be asked to mail it,

20  but I want it to be referenced for those people that want to

21  access it on the docket, but that's the redacted version,

22  not the confidential exhibits.

23           But here's the substantive point.  If you look on

24  that same page -- if I understand it correctly, whether an

25  individual stays in or opts out of the -- the aggregate

1  priority wage claim and vacation and so on doesn't change,
2  but if a person opts out, doesn't the aggregate 1.5 million
3  decline dollar for dollar?  I'm in the class.  I've got
4  $1,000 that I'm given WARN, but I opt out.  It seems to me
5  that 1.5 million should become one million four-ninety now
6  in the aggregate claim for the class, right?
7           MR. BROWN: Yes, it should.
8           THE COURT: But it doesn't say that.
9           MR. BROWN: I believe that's right, rather than
10  being redistributed.  If it's being redistributed --
11           THE COURT: Right.  It isn't redistributed.
12           MR. BROWN: It doesn't get redistributed.  It just
13  gets -- it reduces the grand total.
14           THE COURT: Right.  But the notice doesn't say
15  that.
16           MR. BROWN: Doesn't say that, okay.
17           THE COURT: So that's got to be corrected, and
18  that's not true, though, with the other two, the other two
19  subclasses, correct?  Well, I mean, again, I don't know
20  whether it's -- what is the significance of an aggregate
21  wage claim.  Let's say Mr. Bratton -- again I don't want to
22  say what Mr. Bratton's real numbers are -- let's say Mr.
23  Bratton is owed $2,000 for wages, and he opts out.  Doesn't
24  that bring the subclass aggregate claim down by the same
25  2,000; or does it?

1          MR. BROWN: Is the subclass, per se, vacation?

2          THE COURT: M-hm.  Because --

3          MR. BROWN: If he opts out, he still gets his

4 vacation.

5          THE COURT: He gets it, but the aggregate class

6 claim is lower.  It's maybe semantics, but -- look, Mr.

7 Bratton, if he opts out, is going to get paid his $2,000

8 because he's either scheduled at 2,000 or he's filed a Proof

9 of Claim for 2,000.

10          MR. BROWN: Right.

11          THE COURT: But see, I'm focusing on this phrase,

12 "the aggregate total priority wage claim," is this big

13 figure like -- why is that -- why do we have to do that?

14 Aren't you really saying, at the moment, if everybody in the

15 universe of people in Biggers stays in, these are the

16 amounts that we pay out.

17          MR. BROWN: Yeah, I think -- I mean, again, without

18 getting into a drafting session, I think the fix is, to say

19 something like, if everybody opts in, this is it.  The

20 number may change based on how many people participate.

21          THE COURT: But it really doesn't matter; does it?

22 In other words, you have told me, and I don't think I'm

23 breaching a confidence to say the sealed exhibit has these

24 totals in it.

25          MR. BROWN: Correct.

1    THE COURT: So what difference does it make?  I
2  mean it makes a difference -- I want the Creditors'
3  Committee and Mr. Everett to be keeping track of the
4  dollars, but if I am a person who is making a decision
5  whether to be in the class or out of the class, I don't care
6  about three million.  I'd like three million, but if I'm
7  only to get 5,000, that's my choice.
8    MR. BROWN: So are you suggesting that we just take
9  the aggregate numbers out of the notice?
10    THE COURT: I'm not -- I'm just thinking it out
11  loud with you.  I have not done a class action settlement
12  like this before, in the context of bankruptcy.  I
13  understand if it were out there in the District Court, you'd
14  be circling around classes of people, but frequently, if I
15  understand class actions, you have a pool and the fewer
16  people in the pool, the bigger slice they get.  That's not
17  the case here.  And so what you're really saying under this
18  settlement is the Debtor, with the support of the Committee,
19  has agreed to seven -- whatever the millions of dollars are
20  can be expended.
21    So I don't care -- if you want to talk about an
22  aggregate wage claim in a certain amount, you can do so, but
23  you've got to then reduce it as you move people out.  So why
24  don't you think about what makes the most sense and makes it
25  intelligible.  And yeah, that's right, then you have the --

1    MR. BROWN: I understand the concept and your

2    concern, and we'll address it.

3    THE COURT: Then you have the unsecured amount of

4    four million.  So in round numbers, it's seven and a half

5    million bucks that are going to be unsubordinated and

6    treated in this various fashion.

7    MR. FIERO: Your Honor, for the Court's

8    information, in an ordinary class action, the reason you

9    have all those aggregate numbers in there is so that class

10   members can see those numbers, compare them to the amount

11   proposed to be paid as attorney's fees, and make a decision

12   for themselves about the fairness of those relative numbers.

13   THE COURT: Right.

14   MR. FIERO: And be opt out to suit.

15   THE COURT: But this of course circles back to Mr.

16   Simon's point originally.  I mean, again, I don't -- I'm

17   going to leave it to you all to come up with wording.  I

18   just don't want it to be inconsistent, so the document

19   doesn't say there's going to be a reduction when we know it

20   is a reduction.  So now, whether it be on page 9 right after

21   that table or somewhere else, this is where I wrote down at

22   least, you've got to say when this is going to get paid

23   likely.  And you've got to make sure this notice is clear

24   that the Biggers settlement is a two-step process.  One

25   process is if you're in and it's accepted by the requisite

1  majorities, you have an allowed claim in a certain amount

2  that trumps any Proof of Claim you filed if you're an opt-

3  inner.  But the second and more important one is, and you're

4  going to get paid if there's a Plan confirmed.

5          Now you've got to say it some way.  I don't care

6  how you say it.  It's not clear.  I don't think -- and I

7  read through this thing two or three times -- I don't think

8  I could tell when people are going to get paid.  And if I

9  missed it; I missed it.  But --

10         MR. BROWN: No, Your Honor, you didn't miss it.  I

11  mean I -- we're going to have to think about -- at this

12  point, we're going to have to give some thought to what we

13  can say about that, other than upon Plan confirmation.

14         THE COURT: You can say "upon Plan confirmation."

15  And at the moment, best judgment, I don't know.  I mean I

16  realize it's a delicate issue, but -- minor point, still on

17  page 9, I think where the paragraph begins with "settlement

18  will not become effective if the Court doesn't approve ..."

19  et cetera, or the "opt-out exceeds a specified percentage,"

20  why don't you just put filed under seal.  That has been

21  filed under seal, so that the reader knows that this is

22  something that is a matter of record.  It's not a matter of

23  public record, but it's record.

24         Now I think there's a question then -- this wasn't

25  mentioned the other day, but this is what you get when you

1  send me back to read it again, and it's on page -- I think

2  it's page 12.  As I say, my page numbers are cut off.  13, I

3  guess, it's under the "How to object or opt out."

4          MR. BROWN: Yes.

5          THE COURT: And there's a sentence that says:

6          "If you opt out of the class, you are not allowed

7          to object to any provisions of the settlement."

8  That seems to be contrary to bankruptcy law.

9          MR. BROWN: Okay.  So where are you?

10          THE COURT: See "How to object or opt out."

11          MR. BROWN: Yeah.

12          THE COURT: It's at the end of the second full

13  paragraph.  You think an opt-outer --

14          MR. BROWN: "If you opt out of the class, You are

15  not allowed to object to any provisions of the settlement."

16          THE COURT: Well, why not?

17          MR. FOX: But that's consistent with class action

18  law, Your Honor.

19          THE COURT: So if Mr. Bratton says, I don't want

20  any of this, he can't object on the grounds that it's not a

21  good settlement as a matter of bankruptcy law?

22          MR. FOX: He stays in the class -- he stays in the

23  agreement, but then he objects to the amount.

24          THE COURT: Well what about -- what about an

25  unsecured creditor who is not -- has nothing to do with

1  this, but just wants to object.  As a matter of bankruptcy

2  settlement, can -- Mr. Brown, you're the bankruptcy lawyer.

3        MR. BROWN: I think you could -- that's right -- if

4  you object to this on the basis that you think it's unfair

5  to the estate as a creditor or a constituent of the estate,

6  I don't think that's intended to cover that.  Clearly, under

7  Rule 9019, if you think this is a rip-off for the estate,

8  you're not prohibited from objecting.  I think that what

9  this is intended to do -- and we can certainly clarify

10  this -- is to say, look, if you're objecting -- if you want

11  to object to the settlement because you don't think it gets

12  enough money to you or the employees, then you can't do it

13  if you opt out.

14        THE COURT: Okay.  Well, let's come up with some

15  language then.  Mr. Bratton, your comments the other day

16  really triggered my reaction to this because you're the one

17  that made the point about the A & C factors, and although

18  you still may think that they haven't been satisfied, and I

19  think that they have, I think my point is that I -- and you

20  haven't told me nor do you need to tell me whether you're

21  going to opt out or opt in; it's your business.

22        MR. BRATTON: I don't know yet.

23        THE COURT: It's only your business, but my point

24  is, I never perceived that if you opted out, you lost your

25  right to object as a general matter.  I think if we find a

1  way to divide the world into -- if you're in, you can't

2  complain about the terms.

3          MR. BROWN: Well, I mean, you know, I think

4  what -- you know, there's two things that ultimately on --

5  if there's a final hearing on this, you're going to do.

6  You're going to have to approve it under Rule 23, and you're

7  going to have to approve it under 9019.

8          THE COURT: Right.

9          MR. BROWN: What this is designed to do is to

10  prevent objections under Rule 23 standards if you opt out,

11  not to prevent objections under Rule 9019.

12          THE COURT: Mr. Blum, is that the 23 law, that if

13  you don't want to get your pair of Levis some day in the

14  future, you can't object to the settlement at all?  Your

15  only option is to opt out?

16          MR. BLUM: If you opt out, you cannot object.

17          THE COURT: Well, I think the point is that you

18  can't -- as a creditor, you can't be deprived of your right

19  to object to matters that are beyond what you couldn't do in

20  23.  So you need to come up with some language.

21          MR. BRATTON: Your Honor, might I add a comment?

22          THE COURT: Yes.

23          MR. BRATTON: My thought is that the opt-out date

24  needs to be later than the hearing on final approval, so

25  that the person in my situation is still in if he wants to

1  object to the settlement before he's opting in or out.

2          THE COURT: Well, I'm not -- I need to hear from

3  the experts on that.  I don't know.  It seems to me I'm

4  using my Chapter 11 Plan training, and you always have to

5  have deadlines first.  I mean --

6          MR. BROWN: Yeah.  I think we would -- you know, we

7  need to know whether the blow percentage is met.  We may not

8  even go forward with final approval if it is, so I think

9  it's necessary that we have -- you know, we know what the

10  opt-outs are before we come in here and -- before we

11  determine whether we're going to seek final approval.  We

12  won't do it if we have too many opt-outs.

13          THE COURT: Yeah, I have to go with them on that, I

14  think on that.  By the way, Mr. Bratton, one other point.  I

15  said earlier I'm not going to unseal the -- what we call the

16  blow-up point, and it occurred to me that -- and this is not

17  personal to you.  I think there's too much risk of mischief

18  of somebody trying to hold up if they've got the killer vote

19  at the end.  And I -- you know, if you're the last vote that

20  can kill the deal, it could give rise to mischief, and so

21  that's in part why I'm disagreeing with you and allowing

22  them to do it.

23          MR. BRATTON: But of course what we know is that

24  they've now disclosed it in public  --

25          THE COURT: I didn't say that --

1          MR. BRATTON:  -- two or three ways themselves --

2          THE COURT: I didn't say that.

3          MR. BRATTON:  -- including in a letter that Mr.

4    Blum attached to a declaration.

5          THE COURT: A couple more questions, because I do

6    have to move along.  Mr. Brown, at the bottom of page 14,

7    the statement is made:

8               "A plaintiff class member who opts out, shall have

9               the right to file an individual Proof of Claim."

10   Isn't it too late?  Aren't we past the claims deadline?

11         MR. BROWN: "A plaintiff class member who timely

12              opts out of the settlement agreement shall have

13              the right to file an individual Proof of Claim

14              setting forth on an individual basis the same

15              claims that were set forth ..."

16   And then the next sentence:

17              "Such individual Proofs of Claims shall be deemed

18              timely filed only if it is filed no later than 30

19              days ..."

20         THE COURT: But what final judgment?  I mean after

21   the final judgment in the Biggers settlement?  What's the

22   final judgment that's referred to at the top of the next

23   page?

24         MR. BROWN: Yeah, it would be -- here's what we're

25   trying to do, and maybe this needs to be changed too, but

1  this was plaintiffs' counsel who was very concerned about

2  the impact of the dismissal of the class action and

3  withdrawal of the class Proof of Claim, which I believe has

4  the impact of tolling the bar date for class members.  So if

5  they didn't file Proofs of Claim, then they nevertheless, as

6  long as there was a class -- there had been a class Proof of

7  Claim filed by the bar date, would be entitled to

8  participate.  So the idea here was, if you opt out, and the

9  class Proof of Claim goes away, the class adversary

10  proceeding goes away, and you have not filed a Proof of

11  Claim, that doesn't mean you're without a remedy.  You

12  still -- you know, you get to restart, and we just need a

13  reasonable time here to allow people on notice --

14        THE COURT: But that's overruling in effect what

15  our local rules have already put in place by claims bar

16  dates, and it also is ignoring the presumption of allowance

17  in the amount of the scheduled amount.  So I don't mind if

18  this is what you want to do, but I'm just wondering if it is

19  the right thing to do.  So let's -- again, we're using Mr.

20  Bratton as our guinea pig.  If November 2nd was the deadline

21  for filing a Proof of Claim, and he didn't file a Proof of

22  Claim, by this language, you're giving him a lot more time

23  to do so.

24        MR. FIERO: That's right, because he might have

25  relied on the class Proof of Claim to protect his interests.

1              THE COURT: Okay.  Okay.

2              MR. BROWN: You know, Your Honor, it was -- it's

3    part of the deal.

4              THE COURT: Okay.

5              MR. FIERO: It was negotiated.

6              THE COURT: Okay.

7              MR. BRATTON: Your Honor, I would like to add,

8    because I'm probably on their side on this point.

9              THE COURT: I said okay.

10             MR. BRATTON: All right.

11             THE COURT: At the top of the next page though, is

12   the term "final judgment" defined elsewhere in here?

13             MR. BROWN: The term "final judgment" is defined in

14   the settlement agreement, but it is not defined -- I don't

15   believe it's defined in here.  So we probably need to do

16   that.

17             THE COURT: Well then, let's define it here

18   because -- now my last comment on the notice, I think the

19   last bold language right below that language is a little bit

20   incorrect.  It says:

21             "Should you opt out of the class, you acknowledge

22             by opting out, you relinquish any benefits you

23             would otherwise receive as a member of the

24             plaintiff class."

25   Well, that's not true.  You don't relinquish your wage and

1  priority.

2          MR. BROWN: Well, you know, if -- it is again

3  semantics because you're not getting that as a member of the

4  class or part of the settlement.  You're getting it because

5  it was scheduled, and the Code provides it to you.

6          THE COURT: Well then you've got to put in here,

7  but you're going to get it anyway.  (Laughing.)  I mean

8  you're making my point about, why do we need this?  I

9  still -- I'm still very, very iffy about it, but I said

10  early on in this case, I'm trying not to second guess my

11  judgment for those who are making the decisions for the

12  creditors -- with some exception.

13          MR. FOX: I think what you're saying, Your Honor,

14  is you want us to explain the intersection of the Bankruptcy

15  Code and the class 23, whenever that arises, and certainly

16  it calls for it in that paragraph, and we can fix that.

17          THE COURT: I think the problem, Mr. Fox, is that

18  what the Biggers class settlement is doing without a lot of

19  grief, it's giving people some WARN Act claims, and, you

20  know, on a pie-in-the-sky subordinated basis, some other

21  claims.  But it gets back to my point is, why do we need a

22  class action to allow undisputed priority wage and vacation

23  claims. We don't.  We don't, but we're doing it.  So I sit

24  here and read it and say, well, I'm a member of this class.

25  I'm going to opt out of this class.  I'm relinquishing

1  benefits I would otherwise receive.  I'm really not

2  relinquishing some of the benefits I would otherwise

3  receive.  I'm just getting it with a different label on it.

4  It's the same check for the same amount of money.  So, Mr.

5  Brown, at the risk of being verbose about it, I think we've

6  got to say, but you'll get it anyway.

7          MR. BROWN: Yeah, I think what it needs to say here

8  is, that you'll relinquish your ability to get WARN damages

9  and waiting time, subordinated waiting time penalties, but

10 separate and apart from the settlement or whether you opt

11 out, you're still going to get your scheduled claim for

12 wages and vacation.

13         THE COURT: Okay.  Now, I went through briefly and

14 quickly, I should say, quickly, Mr. Bratton's comments.  I

15 don't know whether we want to talk about it anymore or hear

16 from you on the comments on the hypotheticals, or, Mr.

17 Bratton, if you're satisfied with the proposed changes that

18 Mr. Brown's willing to go with, we don't have to take time

19 to talk about it, but --

20         MR. BRATTON: I'll try to be as efficient as I can

21 here, Your Honor.  I know we're going to be brief, but I got

22 his last revision handed to me ten minutes before the

23 hearing.  I've looked at it.  He's accepted a lot of my

24 language changes, which is good.  I just have broad points,

25 I think.  The charts ought to be more complete than they

1 are.  The chart that describes what you get under this

2 settlement tells you how much money they're going to give in

3 what categories.  It doesn't tell you what number of total

4 filed claims that was against.  It should tell you what the

5 true starting point is.

6        THE COURT: Well, why, for the priority, is that

7 necessary?

8        MR. BRATTON: Because the filed priority claims are

9 bigger than the number that they have here.

10        THE COURT: Well, yes, but that's the point.  The

11 notice is going to give each addressee --

12        MR. BRATTON: But it should tell the group en masse

13 what the total reduction being suffered here is.

14        THE COURT: Okay.  Well I -- unless the Debtor

15 wants to do this, I don't agree with you.  I don't think

16 that's necessary.  So I'll overrule that objection.

17        MR. BRATTON: Okay.  The second point is in Exhibit

18 1.  It's going to look like an Exhibit A that I've never

19 seen, and it's going to say, this is the numbers that you

20 get individually, so you'll know that.  But it's not going

21 to tell you why; it's not telling you why they reduced your

22 claim in this fashion.  So it should be individualized in

23 the sense of, you're getting these numbers, and the

24 reductions were because of a, b, and c.

25        THE COURT: Well, I think that would be far too

1  cumbersome.  I think there's two answers to that.  If you

2  think you're owed $6,000, and the notice you get says five,

3  you have on an informal basis, a phone -- you can call on

4  the phone and say, what happened to my other thousand.  You

5  have formal discovery.  You have objections.  You have a

6  panoply of options, but in general, I don't think they have

7  to do that.

8             MR. BRATTON: Very broadly, I --

9             THE COURT: And but by the way, I've looked at the

10  exhibit that you haven't been allowed to see, and it's got

11  800 lines on it, but you're going to get one line that's

12  going to give you each of the categories that has your

13  numbers in there, and --

14             MR. BRATTON: I understand.  What I'm getting and

15  what I'm not getting.

16             THE COURT: Well, but I think that unless you -- if

17  you have a significant difference between what you think

18  you're owed and what you're scheduled -- which you already

19  have access to the schedules --

20             MR. BRATTON: I don't think as procedure, this is

21  consistent with Commercial Western Finance.

22             THE COURT: Well, I know Commercial Western Finance

23  better than anybody.  What does this have to do with

24  Commercial Western Finance?

25             MR. BRATTON: There is a procedure specified under

1    the Code for doing these things.  They have to do an

2    objection that tells you why there are reductions.

3            THE COURT: But this isn't an objection.  You have

4    the right -- you have the right to rely on your claim.  That

5    was the point of the whole discussion.  You almost convinced

6    me this should be an opt-in rather than an opt-out.  I'm

7    persuaded now with adequate notice, it's opt out, but you're

8    free to opt out, in which case, they've got to object to

9    your claim.

10           MR. BRATTON: You understand my point.

11           THE COURT: No, I do.

12           MR. BRATTON: My last point is that I do believe

13   that all creditors should be allowed to see the complete

14   settlement, which is with all the exhibits.

15           THE COURT: Okay.  Well, there's two exhibits that

16   I've agreed to seal, and those two remain sealed.  I'm

17   sorry -- for the reasons that I've stated.  Mr. Simon, do

18   you want to raise anything further or comment either on --

19   you're the one that I think asked for the hypotheticals.

20   The hypotheticals seem to do the trick for me, since I love

21   hypotheticals.  What do you think about them?

22           MR. SIMON: If I may, Your Honor.

23           THE COURT: Sure.  Just stay near a microphone.

24           MR. SIMON: Your Honor, although my comments to,

25   for example number 1, with John --

1          THE COURT: Okay.

2          MR. SIMON:  -- because the deficiency I see is

3   throughout all three of them, and what I would say is that a

4   file clerk who receives this and who reads this won't

5   understand or might not understand that the remainder of

6   their WARN Act claims, in this case for John, it's

7   $7,529.28.  That's in the second to the last paragraph.

8          "... are released forever at zero percent."

9   You see both sides here are buying peace.

10          THE COURT: Wait.  I haven't found the paragraph

11  you're looking at.

12          MR. BROWN: You mean waiting time penalties?  I

13  think you're referring to it, the last paragraph?

14          THE COURT: Waiting time penalties.

15          MR. BROWN: The 7595 number is waiting time.

16          THE COURT: Is that what you mean?

17          MR. SIMON: No, no, I'm not.  No.  I'm referring to

18  7529.28.  That would be the remainder of the WARN Act

19  claims.  You may not see that number here because I

20  calculated it by figuring out what isn't being paid to John

21  from what his claim is.

22          MR. BRATTON: It's the residual of the 20,000, I

23  think is what he's saying.

24          THE COURT: Well, you took the 20,000 minus the

25  12747 that he's getting?  I guess I'm not sure I follow you.

1    I see -- I don't --

2           MR. SIMON: If I may?

3           THE COURT:  -- you see the 20,177, that's what

4 John says he's entitled to under the WARN Act.

5           MR. SIMON: It's my understanding John says he's

6 entitled to 20,177.

7           THE COURT: Right.

8           MR. SIMON: Okay.  Of that, he will be receiving a

9 certain percentage as a priority; am I right there?

10          THE COURT: Well, no, he's used it all up with his

11 vacation, and John doesn't have any WARN in the priority

12 category.

13          MS. MORGAN: It's all non-priority WARN.

14          MR. BROWN: This is complicated, and these examples

15 are somewhat complicated.  We tried to be extremely clear

16 here, and there comes a point where the more verbiage you

17 put in it, the more confusing it gets.

18          THE COURT: No, I understand.  I understand.

19          MR. BROWN: So, you know, there has been a real

20 effort here to try and cover the various permutations and

21 give examples that over and above the notice -- I mean you

22 could figure this out from the notice, but this kind of

23 makes it concrete.  And, you know, you could go on forever

24 with different permutations, Your Honor, and --

25          THE COURT: Wait til those judges in Delaware get

1  this as an example, huh?  They'll never be the same.

2      (Laughter.)

3          MR. SIMON: Your Honor, could I ask my colleagues

4  across the aisle a simple question, and maybe this will

5  help.

6          THE COURT: Yes.  Sure.

7          MR. SIMON: Are there any WARN Act monies, not

8  penalty monies, just the WARN Act pay itself, that is

9  released through the settlement?

10          THE COURT: That's released.  What do you mean

11  "released"?  Yes.

12          MR. SIMON: That is paid out at zero dollars.

13          THE COURT: It's going to vary by individual; isn't

14  it?

15          MR. BROWN: Well, I think there's a percent –- I

16  mean, the way I understand it, Your Honor, and I don't know

17  what the percentages are, but we have allowed –- there's a

18  certain number of maximum theoretical WARN claims, right?

19  That would be if everybody –- if there were no defenses,

20  that everybody would be entitled to their 60 days pay and

21  benefits.  And what we've done in negotiations with Blum

22  Collins, you know, we said, look, this is not a hundred cent

23  pay WARN case because there are significant and strong

24  defenses here.  And I think everybody acknowledged that.  So

25  based on the defenses that exist, there was a discount on

1  the WARN claims.  There was one discount for the priority

2  portion and one discount for the unsecured portion.

3          THE COURT: And in John's case, it's a 37 percent

4  discount.  So Mr. Simon, John -- Blum Collins has negotiated

5  for John.  He's going to get allowed two-thirds of his non-

6  priority WARN claim, which may in turn only produce so many

7  cents on the dollar, but to get that, he has to release non-

8  debtor defendants.  That's all.  That's the deal.  And it

9  doesn't matter whether if -- assuming that Heller Ehrman,

10 LLP itself isn't getting a discharge, it doesn't matter

11 whether it's released or not.  There's nothing left for

12 them.  So that's the way it works.  I think Mr. Brown's

13 point is well taken.  We can't deal with every hypothetical,

14 but, you see, as part of the settlement, Heller has agreed

15 to allow approximately 63.18 percent of the general

16 unsecured WARN claims.  That's the compromise.  If John want

17 to hold out for a hundred percent, he needs to know two

18 things.  First, he'll have to fight his own fight, and

19 secondly, even if he wins, he may only get 20 cents on the

20 dollar.

21          MR. SIMON: Of what he does win.

22          THE COURT: Yeah, I mean everybody has to keep in

23 mind, litigating a WARN claim here is fighting for

24 discounted dollars unless Willoughby hits the jackpot.

25          MR. SIMON: The point that I would make here is

1   that -- the clarification I would ask is that the 37 percent

2   that is being released be expressly stated that it is being

3   released.

4          MR. BRATTON: You want it as a dollar figure.

5          MR. SIMON: Or a percentage.

6          THE COURT: What would you have -- what words would

7   you insert?

8          MR. SIMON: That the -- it looks like 36.82 percent

9   is released forever, and it will not be paid out.

10         THE COURT: Any problem putting those words --

11  words like that in?

12         MR. BROWN: What about just saying, this is the

13  total amount that he will be entitled to, you know, this is

14  the total of his allowed claim?  I mean I think, you

15  know -- Your Honor, I do think it says this so many times

16  throughout the agreement that this is what you're going to

17  get, and over and above this, you're not going to get

18  anything if you don't opt out.  So, you know, do I have a

19  problem with it?  It's not a problem with a capital P; I

20  just think it is, you know, redundant to the nth degree.

21         THE COURT: Yeah, Mr. Simon, I have to agree with

22  Mr. Brown.  At some point, if our examples become so

23  complicated we need examples to prove the examples, then

24  something is wrong, and I appreciate it.

25         MR. SIMON: I understand that.

1          THE COURT: I got the impression from Mr. Collins
2    the other day, and I'm sure Mr. Blum would support this,
3    that employees have access to their class counsel to
4    straighten them out, what does this mean.  I'm not saying
5    you have to do it or Mr. Bratton, just because you were good
6    enough to come here and fight the fight, but I mean we've
7    got a system in place that allows people that might be
8    confused by this to at least get some information from
9    people that are on their side and frankly people that are
10   not on their side.  I mean I would expect the Debtor's
11   counsel or Committee's counsel, if asked, to explain his
12   interpretation of this, if asked.
13         MR. SIMON: Your Honor, if I may for just one more
14   moment.
15         THE COURT: Yeah.
16         MR. SIMON: I don't know what Exhibit A will look
17   like for me, and perhaps my concern here would be addressed,
18   if I saw that.  I'm not asking the Court to show me.  I'm
19   sure it's not available.  But --
20         THE COURT: Actually it is available.  I have it
21   right here.  I have the sealed Exhibit A.
22         MR. SIMON: What I'm trying to see is -- the notice
23   the way it's written right now, it tells me what I'm going
24   to get in the sense of percentages.  You're going to get
25   this, and you're going to get that.

1          THE COURT: No, it says it in dollars, in real

2     dollars.

3          MR. SIMON: What I'm telling you what the notice

4     says right now, not what the exhibit --

5          MR. BROWN: But the exhibit is going to be attached

6     to the notice and tell you what dollars you're going to get.

7          MR. SIMON: Let me finish my one thought.  Let me

8     just finish.

9          THE COURT: Go ahead.

10          MR. SIMON: But it doesn't tell me in clear terms

11     what I'm giving up to get that.

12          THE COURT: Well, I think there was an attempt to

13     do it on the hypothetical, and we can't do it in every case.

14     I'm not going to read your personal information on the

15     record, Mr. Simon, but I'm going to tell you that opposite

16     your name -- it's David, right?

17          MR. SIMON: Yes.

18          THE COURT: There is a dollar figure.  There's a

19     number of days or the dollar figure for vacation and a

20     dollar figure for WARN, a dollar figure for the priority

21     amount, dollar figure for the portion of the WARN entitled

22     priority, dollar for the WARN unsecured; and the total, and

23     the total of your subordinated claim.  And I think that

24     there are, in your case, and some people don't have numbers

25     in some columns; some do.  Leaving aside days, but dollars,

1  one, two, three, four, five, six, seven, eight, nine -- ten

2  columns to look at, and you're going to get an exhibit

3  that's going to, I presume, have the same data that I see

4  opposite your name, with the headings.  And I think that

5  that's far more than you can hope for.  If you think you're

6  owed more, you have the right to vote out and get out.  I

7  can't make them go beyond that.  It would be just too

8  cumbersome.  So I'll overrule that objection beyond that.

9          And I've got to speed up the process now, just

10 because of time commitments.  Mr. Blum?

11         MR. BLUM: Your Honor, Bonnie Menicucci who's

12 sitting next to me is an employee creditor, who would like

13 to make a very brief statement for the record.

14         THE COURT: Okay.  Ms. Menicucci.

15         MS. MENICUCCI: Thank you.  Thank you, Your Honor.

16 I was a corporate legal secretary at Heller Ehrman, and I'm

17 currently unemployed.  Due to the dissolution, there's no

18 COBRA available, so part of the hardship is the monthly

19 medical cost of $770, and, you know, moving in with

20 relatives.  So there's been some hardships.  My situation is

21 that I had no accrued vacation.

22         THE COURT: No what?

23         MS. MENICUCCI: No vacation, no vacation, and so I

24 did contact several attorneys because I was under the

25 assumption -- I was confused with the first notice that I

1  would be on the schedule, and I was on the first matrix, and

2  by the time after I had foot surgery, and I realized that I

3  wasn't on the schedule, that I needed to file a claim.  So

4  unfortunately I was late on my claim, and -- but the money

5  that I'm looking forward to is the WARN and if the

6  settlement goes through, I would hopefully get, you know,

7  WARN wages, and this looks to be the only avenue for me to

8  get the WARN wages, and not being savvy, I did, you know,

9  contact Teresa Blasburg several times because this process

10 is confusing to me.  And she did help me on quite a few

11 occasions, and I did talk to her a few times, and I did

12 contact several attorneys because I was concerned about my

13 late claim.

14        And at the moment, the status of my late claim, is

15 that it has been objected to.  But it is -- I do have an

16 open extension.  But as far as getting help from other

17 attorneys, Heller Ehrman attorneys, I have not seen any

18 groups of attorneys organized, except from these two

19 attorneys here to help employees who are staff employees to

20 get through this.  And I'm just hoping to, you know, get

21 through this.  I'm thankful that there is a class action

22 suit to help employees because otherwise I would not, you

23 know, know what to do, and I have sought other counsel but I

24 don't have the funds to hire an attorney.  So especially

25 with the objection, I was fortunate enough to contact an

1  attorney, and I was fortunate enough to get an open
2  extension.
3         THE COURT: Well, let me stop you.  The late claim
4  is irrelevant if Ms. Menicucci stays in the class, right?
5         MR. FIERO: Yes, Your Honor.  We've discussed this
6  with Ms. Menicucci in the past and granted her an open
7  extension.
8         THE COURT: Yeah, I see your name on here.
9         MS. MENICUCCI: So that's why I'm just –- I'm
10 really –- I'm for the settlement.
11        THE COURT: For the class.
12        MS. MENICUCCI: I am for the class, and that's why
13 I'm here.
14        THE COURT: Okay.  Well, Ms. Menicucci, my comments
15 were not to deprive you or your colleagues from getting
16 paid.  We were only debating how you get paid.
17        MS. MENICUCCI: Okay.
18        THE COURT: And that was my resistance to the class
19 as not being necessary, but I'm going to go ahead and do the
20 preliminary certification and preliminary orders that I've
21 been requested to, as soon as we get these changes made.
22 And so, Mr. Brown, I need some suggestion from you in terms
23 of timing.  I don't think we have to have another hearing,
24 but you have to –- I mean another preliminary hearing –- but
25 I need to see a revised agreement and revised notice, and I

1  guess I have to insist that the other counsel who have

2  objected be provided with it and maybe take a short period

3  of time for them to voice any concerns and then if I feel I

4  need a hearing, I will do one on an expedited basis.

5  Otherwise, I'll sign the order.

6      MR. BROWN: I'm going to get the changes that we

7  discussed today and put it into the order.  Again, there are

8  a few cooks here, so I'll have to circulate it.  I'm

9  reluctant to say I'll circulate it tomorrow because of the

10  internal kind of requirements for review.  But I think

11  Thursday is reasonable.  I'll try and get it out Thursday.

12      THE COURT: Well, I guess what I'm saying is that I

13  would like to see a revised settlement agreement on the

14  court's docket so it can be referenced.  I don't care; it

15  can just be a declaration, and a revised notice that takes

16  the comments that I've made and the comments that Mr.

17  Bratton made that you've agreed to, and then if you provide

18  me with chambers copies of those and upload an order, I'm

19  going to give Mr. Bratton and Mr. Simon a reasonable time to

20  scream if they have a further complaint.

21      But for both of you, please, it's not an

22  invitation to reargue.  It's just to point out if you think

23  there's been something that I asked for or that Mr. Brown

24  committed to that didn't make it.  Let me know, and if I

25  feel -- I mean obviously I'm very concerned about getting

this right also, and if I believe we have to have another

hearing, we'll have one on an expedited basis.  But if not,

I'll just sign the order.

MR. BRATTON: Your Honor, I entirely understand

about no re-argument, and I will be very focused on making

it clear.

THE COURT: Okay.  Well, why don't we -- why don't

I say this.  Mr. Brown, I'm going to give the two counsel

who voiced their objections five days after they get

something to me.  If I don't hear from them in five days,

I'll assume that they have no further objections, and we

won't have a hearing if I don't think we need one.  And I

don't anticipate it because I expect you're going to do what

I said.  That's five days, days now.  Under the new rules

that go into effect on December 1, it's days, not work days.

MR. BRATTON: I appreciate that amount of time,

Your Honor.

THE COURT: And you can just talk to Ms. Parada

about getting dates and so on.  So we're vacating the status

conference date that I told you about.  Now I do have to

move quickly because of commitments, like giving a program.

MR. BROWN: One housekeeping matter, Your Honor.

THE COURT: Yes.

MR. BROWN: And Alexa Morgan will address the

Court.

1          MS. MORGAN: We're going to submit a revised

2    Exhibit A along with those other documents.

3          THE COURT: Revised what?

4          MS. MORGAN: A revised Exhibit A.  We noticed that

5    there were -- there was one employee who appeared twice on

6    there and one employee who was mistaken.  As a result, some

7    of the numbers got shuffled.

8          THE COURT: By the way that -- that's fine.  That

9    reminds me of something else.  How do the people who are not

10   eligible to be in the class know that they're not eligible

11   to be in the class?  I think you've got 45 people or 46

12   people.  Aren't there --

13         MS. MORGAN: There's an exhibit that -- yeah, that

14   was --

15         THE COURT: Yeah, but how do they know?  What are

16   they going to get served with?

17         MR. BROWN: I think they're getting nothing.

18         THE COURT: But how do they know they're not on

19   the -- they just won't get -- nothing.

20         MR. BROWN: They just won't get notice.

21         THE COURT: They won't get nothing (Laughing).

22         MR. BROWN: They won't get a notice that they're

23   entitled to participate.  I mean we're only providing notice

24   to class members.

25         THE COURT: Okay.

1        MR. BROWN: And they get a right to opt out.  And
2    this will have no impact on those who are not members of the
3    class, and so why give them notice.

4        THE COURT: And if somebody thinks that he or she
5    should be in the class, then we can deal with that
6    separately.

7        MR. BROWN: They can call us -- yeah, they can call
8    Blum Collins or call us, and we'll look at it again.

9        THE COURT: Okay.

10       MR. BROWN: And, Your Honor, that frequently does
11   happen.  I mean you miss people and they get put in if they
12   should have been put in.

13       THE COURT: I understand.  Understood.

14       MR. FOX: And, Your Honor, just real quickly, one
15   other housekeeping matter.  If I could move to seal Mr.
16   Blum's inadvertent reference to the blow-out percentage.

17       MR. BRATTON: Too late, Your Honor.

18       THE COURT: Look, I can't -- there's nothing I can
19   do about it.  I mean what do you want me to do?  I've got a
20   room full of people.  I've got an electronic record.  I
21   can't seal the transcript.

22       MR. FOX: Well, that's what I was asking, Your
23   Honor, is to seal the transcript, at least that portion.

24       THE COURT: Well, I mean it's an electronic file.
25   It's a digital file.  I don't know.  Ms. Parada, do you know

1  if people have been requesting transcripts of any our

2  hearings?

3          MR. BRATTON: They're posted, Your Honor, the

4  transcripts.

5          THE COURT: Just the front page, aren't they?

6          MR. BRATTON: I thought they were provided now.

7          THE COURT: Oh, after a period of time, after a

8  period of time.

9          MR. BRATTON: They do appear in their entirety.

10          MR. BLUM: Well, I did say, "or whatever the number

11  may be," after I gave the hypothetical example.

12          THE COURT: Well, Mr. Fox, look, I mean obviously I

13  can't tell people -- I'm not going to issue an order now to

14  pretend -- this isn't like a jury, to say disregard what you

15  heard, because they all regard it anyway.  And I guess I

16  could order this transcript sealed, but as soon as I get a

17  request to see it, what am I going to do, deny it?  I

18  can't -- it's a digital electronic record.  We can't just

19  blank out things that people have said, I don't think.  I'd

20  have to talk to the technical people.

21          MR. BRATTON: Your Honor, on the admin as well, may

22  we have permission to e-mail Ms. Brister with this comment

23  process that we're going to go through, rather than hand

24  delivering chambers copies to the intake?

25          THE COURT: Yes, that's fine.

1          MR. BRATTON: Thank you.

2          MR. FOX: I appreciate your consideration, Your

3 Honor.

4          THE COURT: Well, I mean, look, I don't -- we have

5 had sealed records, but they're sealed in advance, and I

6 don't know -- I'll ask Ms. Parada, you don't -- I mean the

7 only way you can do it is to break this into two different

8 files, right?

9          THE CLERK: (Inaudible).

10          THE COURT: Well, we could find where it was said,

11 but I don't know how we can go about -- well, Mr. Fox, I'm

12 not going to issue an injunction to people in the courtroom

13 that heard what was said.  I can't do that.  I will look

14 into, with my staff, whether there's a way to excise a

15 portion or seal a portion of an electronic record, but don't

16 be optimistic about it.

17          MR. FOX: Thank you, Your Honor.

18          THE COURT: There's no secrets on the Internet.

19          Mr. Fiero, I said that I needed to talk to you

20 about who needs to be given notice of the cancellation of

21 next week's hearing that's not electronic.  There have been

22 a handful of objections that have come in.  I presume you're

23 received them; haven't you?

24          MR. FIERO: Yes, Your Honor.  I have a little

25 binder on my desk.  It's less than ten.

1        THE COURT: And I originally thought maybe this

2  should be noticed to everybody, but then I realized that's

3  an unnecessary expense, and if there's someone who just

4  shows up and didn't know about it, I'm sorry they'll be

5  inconvenienced.  But I guess I would ask that you make sure

6  written notice of my order goes out to anyone that has filed

7  an objection to the Disclosure Statement that's not an

8  electronic filer.  Can you do that?

9        MR. FIERO: Yes, that's not a problem at all.  We

10  can do it this afternoon.

11        THE COURT: Well, tomorrow is fine.

12        MR. FIERO: Okay.

13        THE COURT: Okay.  Well, you managed to get me in a

14  corner where I can't talk about the commissions, the buyer's

15  premiums, for very long here, so let me move quickly to

16  that.

17        MR. BRATTON: Thank you, Your Honor.

18        THE COURT: Does anybody else want to raise

19  anything further on the Biggers settlement?

20        MR. BROWN: Thank you, Your Honor, and thank you

21  for putting in the time to the notice and --

22        MR. BRATTON: Thank you for your patience with us,

23  Your Honor.

24        THE COURT: That's why I get the big bucks, Mr.

25  Bratton.

1         The thing that troubles me about the way this
2    Bonhams has come out is I have posted on my court's website
3    for 15 years my prohibition against buyer's premiums –- 15
4    years, and my purpose today is not to criticize lawyers, but
5    I go, does anybody read this stuff?  Obviously not.  And
6    then in the application to employ Bonhams, it's a secret.
7    There's nothing in the paper about a buyer's premium.  If
8    you dig down, you come to the consignment agreement and you
9    find in this one tiny little sentence that you need
10   eyeglasses for that a buyer's premium, based upon the bid,
11   will be as stated in the catalog.  And the catalog is
12   nowhere to be found.  So it is impossible to know.

13        And then to prove that I'm off base, you give me
14   examples of three other cases where there have been buyer's
15   premiums, two of which there are no seller's commission.  I
16   mean we did an analysis of the Polaroid, Refco and Lehman
17   Brothers and far and away, Heller got the worst deal.  And
18   I'm supposed to sit here and I'm supposed to say, oh Gosh,
19   there's an auction next week, and I'm supposed to give away
20   this staggering commission that nobody told me about.

21        MR. GAMMON: Your Honor, may I just make a comment?
22   I'm Martin Gammon from Bonhams.

23        THE COURT: Yes, sir.  You can't.  You are not an
24   attorney.  I read your declaration.

25        MR. GAMMON: Okay.

1    THE COURT:  I'm sorry, sir, it's nothing personal.

2  Your company, Butterfields in San Francisco has been

3  known -- other people there have known about my policy for

4  years and years and years.  So, Ms. Khatiblou, with that, I

5  am really put in a defensive, like I'm the bad guy, and I've

6  got two big bankruptcy cases with no percentage being paid.

7  In fact, in Refco, Christie's is paying Refco six percent.

8    MS. KHATIBLOU: Your Honor, with regard to those

9  examples, the Polaroid and the Refco case, the art

10 collections in those cases were worth billions of dollars.

11   THE COURT: You know what, you gave me the

12 examples.

13   MS. KHATIBLOU: Right.  Right.  But this is why our

14 case is different from theirs.  This is why there was no

15 seller's commission in those cases.

16   THE COURT: Why wasn't it disclosed?

17   MS. KHATIBLOU: Your Honor, I assume full

18 responsibility for that, and I do apologize.  I don't mean

19 to put you in a defensive posture.  When we focused on the

20 application, we focused on the Debtor's -- the seller's side

21 on fees and not the buyer's fees.

22   THE COURT: But has anybody rebutted my compelling

23 argument that I got with my Google search?

24   MS. KHATIBLOU: Which was?

25   THE COURT: I sent it to you.

1    MS. KHATIBLOU: Oh, the Townsend article?

2    THE COURT: Yeah.

3    MS. KHATIBLOU: Your Honor, in your hypothetical,

4  we would agree with the conclusions set forth by that

5  author, because in his world, there are comparable auction

6  houses that provide the same services.  And so if we had the

7  option choosing Bonhams versus Sotheby's and Sotheby's was

8  not in charge of the buyer's premium, we would most

9  certainly have gone with Sotheby's.

10   THE COURT: Do I have anybody telling me what

11 Christie's would do?

12   MS. KHATIBLOU: Your Honor --

13   THE COURT: Christie's did it with Refco at no

14 commission.

15   MS. KHATIBLOU: Because of the value of the art

16 being sold.  They were making a tremendous profit.

17   THE COURT: I know, but I could have had Mr.

18 Everett say I contacted Christie's and, you know, two or

19 three others, and I struck out across the board, but I

20 didn't get that either.

21   MS. KHATIBLOU: In Mr. Everett's declaration, he

22 did mention that he did contact Sotheby's, and Sotheby's was

23 only interested in selling a very small portion of the

24 Debtor's fine art collection.

25   THE COURT: I know that.  I know that.

1          MS. KHATIBLOU: And I don't believe they contacted

2     Christie's, but I know from just the market in general, all

3     major fine art auction houses charge a buyer's fee.

4          THE COURT: Ms. Khatiblou, that's because they get

5     away with it, and it's a fiction to pretend.  Who's paying

6     the buyer's commission, in fact?

7          MS. KHATIBLOU: Absolutely, in fact --

8          THE COURT: In fact, the seller.

9          MS. KHATIBLOU: Absolutely.

10         THE COURT: And don't tell me any other way.

11         MS. KHATIBLOU: We're not.  Absolutely it comes out

12    of our revenues, absolutely true and accurate.  We were just

13    unable to find someone who was willing to sell our entire

14    art collection without a buyer's commission.

15         THE COURT: Well, it would have been nice to have a

16    declaration that said that.  I contacted five brokers, and

17    they all told me to stuff it.

18         MS. KHATIBLOU: We could have probably done a

19    better job on the declarations, and I apologize for not

20    doing that, Your Honor.

21         THE COURT: You know what?  You might have been

22    able to do a better job at the outset.  This is not

23    making -- I'm not Congress, and I have had views about

24    sharing of commissions in real estate deals, but sometimes I

25    have to give up and I cannot say, if there's no way to sell

1  this particular art without paying it, then what am I going
2  to do, say no, you have to give it to the Salvation Army?
3  But the point is that it's a lousy record, and it gets even
4  lousier when you give me all these other ones and then
5  distinguish them.  Then you shouldn't have given them to me
6  in the first place.
7         MS. KHATIBLOU: The purpose of giving those
8  examples was to show you that in another bankruptcy cases,
9  buyer's premiums are the norm.
10        THE COURT: That's because -- you know, I've talked
11  to judges in less metropolitan parts of the country and
12  asked them if they allow buyer's premiums, and they don't
13  even know what buyer's premiums are.  They've never heard of
14  them in some places of the world, and I understand.  We're
15  sophisticated here, and New York is a big city, and that's
16  the way they do it, and I can't second guess the decision of
17  the Debtor to choose to use a prominent -- and again,
18  there's no criticism of Bonhams Butterfields, but it's just
19  one of these things where now, with a sale three days from
20  now or whatever it is, and oh, we sent them to New York and
21  we have to absorb all that fee.
22        You know, at one point I could say, well then you
23  talk to the gentleman from Bonhams and tell him he needs to
24  lower the seller's commission even further.  And then you
25  can have the auction.  And he'll say, no, we won't, and I'll

1   say fine, and blame it on the judge.

2         MS. KHATIBLOU: We have had that conversation, Your

3   Honor.

4         THE COURT: Yeah.  Do you want to tell me there are

5   any changes?

6         MS. KHATIBLOU: No, unfortunately there are no

7   changes.

8         THE COURT: Mr. Willoughby, were you aware of my

9   position on this before the fact?

10        MR. WILLOUGHBY: No, I was not, Your Honor.

11        THE COURT: Well so much for posting procedures on

12  the Internet for 15 years.  What do you want me to do, Mr.

13  Willoughby?  It's your money.

14        MR. WILLOUGHBY: Your Honor, I'd like to hear -- we

15  have deferred to Mr. Everett and the Debtor.  I guess Mr.

16  Sugarman is the dissolution committee member who's been

17  running the point on the negotiation, as well as Mr.

18  Everett.  We have not duplicated an analysis.  We've

19  deferred to them on their business judgment.

20        THE COURT: So is that way -- in other words, you

21  don't want to recommend that I grant this motion for

22  reconsideration?

23        MR. WILLOUGHBY: Your Honor --

24        THE COURT: Go ahead, I won't be mad at you.  You

25  can recommend it if you think it's the right thing to do.

1    MR. WILLOUGHBY: Whatever maximizes the return to
2  the estate right now.  If that means going forward with the
3  sale, we'd prefer to go forward with the sale.
4    THE COURT: Well, look, I have no way of knowing,
5  and again, I don't want to turn this into I have a thing
6  against Bonhams.  I have nothing against them, and I'm
7  sorry.  The representative of Bonhams, I don't mean to be
8  rude to him; it's that corporations are supposed to speak to
9  attorneys, and this is just one of those things where I'm
10 the only one in the whole world that raised the question,
11 and it was a pretty poor way that it was presented, and now
12 I'm backed into a corner with a sale about to be three days
13 from now and a commission that, you know, presumably, quote,
14 "everybody does," but the very examples I was given were so
15 distinguishable that -- that they don't really help much.
16 And if I said no, I still won't change it, then I don't know
17 what happens, frankly.  I guess the art sits there or
18 Bonhams sends you a bill for storage.  I don't know what
19 happens.
20    MS. KHATIBLOU: Your Honor, if I may, if I proffer
21 some evidence that Mr. Everett would testify to.  They have
22 consulted numerous auction houses throughout the United
23 States, some which were local, and various art galleries.
24 We alluded to that in his declaration.  And to the best of
25 his knowledge, there were no art auction houses that

1 were --

2        THE COURT: I know, but as I said, if we had a

3 competent witness like Mr. Everett say, I called this one

4 and this one and this one and this one and this one, and got

5 told no, that's different. You know what, I think even

6 locally I've had a couple like this, and they've said, oh,

7 okay, we'll do it, and they just do it. They just say

8 there's no buyer's commission on this lot, and I've seen it

9 in their catalogs, and they get by. This is just a question

10 of who's in the better position and the market forces. I

11 mean, sure, Heller unfortunately doesn't have ten million

12 dollars worth of art like Lehman's did, I guess, or Refco,

13 and I suppose if you had ten million dollars worth, you

14 know, the market force itself would change the outcome.

15        I'm as troubled by the way it was presented,

16 frankly, Ms. Khatiblou, it's just not -- I mean I wonder

17 what's the point in posting these procedures if they're just

18 ignored.

19        MS. KHATIBLOU: Your Honor, again, my apologies.

20 That was completely my fault, my oversight.

21        THE COURT: I know. I'm not doing this purposely

22 to humiliate you. I'll go ahead and grant the

23 reconsideration, but I tell you, I'm very, very distressed

24 at doing it, but I think the result is to go ahead and make

25 the sale.

1          MR. EVERETT: May I make a comment?

2          THE COURT: Yes, sir, Mr. Everett.

3          MR. EVERETT: The bigger issue really is -- and we

4   didn't put this in my declaration, because frankly if we

5   were able to get additional concessions, then that would

6   have be fine.  We're not opposed to those, but the bigger

7   issue is, there was no other auction house.  We did contact

8   Sotheby's; we contacted Wexler's; we contacted an

9   international; we contacted Clar's, who is a local --

10          THE COURT: But Clar actually is done locally

11  here --

12          MR. EVERETT: Exactly.

13          THE COURT: But they've also pulled the buyer's

14  commission out of lots that I've approved.

15          MR. EVERETT: Well, that may be, but the bigger

16  issue really is, there was no other auction house that would

17  take all of this.  What we would have had to have done is

18  find multiple auction houses or multiple methodologies, and

19  the cost of that would have been a lot more than the buyer's

20  premium.

21          THE COURT: Look, Mr. Everett, why couldn't I get a

22  declaration that said that.

23          MR. EVERETT: I don't know.

24          THE COURT: A declaration ahead of time.  Again,

25  I'm not -- I don't want Ms. Khatiblou to apologize again --

1   if the application came in with a declaration from you that
2   said, I contacted these five people.  They all told me to
3   stuff it, or here's why we can't do it.  I'm not -- I can't
4   be completely oblivious to the market forces.  I got
5   nothing.  I got no disclosure of the buyer's premium --
6   none.  And then after the fact, with days to go before the
7   sale, I get your declaration that didn't mention these other
8   companies.  I believe you.  You didn't make that up.

9            MR. EVERETT: There were strategic reasons and -- I
10  understand.

11           THE COURT: I just -- I want to just express my
12  frustration with ignoring procedures and putting me in a
13  spot that I think could have been avoided.  I'm going to
14  grant the motion for reconsideration because the bottom line
15  here is to try to get the art sold, and not to create more
16  confusion, but I really -- I really -- if it happens again,
17  I don't know what I'm going to do.  I'm probably not going
18  to give in.  I'm just going to be stubborn.

19           MR. EVERETT: I understand, and in the future, for
20  anything that happens, I will ask on behalf of both the
21  Committee and the Debtor --

22           THE COURT: And if you call up the auctioneer, and
23  you say that s.o.b. judge won't budge -- you know, you
24  should have heard them all go crazy around here when I came
25  on the bench and said I won't let real estate brokers

1  represent the buyer and the seller.  Oh, it was the end of
2  the world.  You know, they would all go out of business.
3  But somehow, they all managed to get the sales done without
4  representing both sides of the deal.

5          MR. EVERETT: I understand.

6          THE COURT: You can submit an order, Ms. Khatiblou,
7  just for the reasons stated on the record, the motion for
8  reconsideration is granted.

9          Good luck on the auction, sir.  I'm sorry if I was
10  short with you.  I didn't mean it personally.  Please bring
11  in a lot of money and earn yourself a bigger buyer's
12  commission.

13      (Whereupon, the proceedings are concluded at 3:21 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4                    CERTIFICATE OF TRANSCRIBER

5

6          I certify that the foregoing is a correct

7    transcript from the digital sound recording of the

8    proceedings in the above-entitled matter.

9

10

11   DATED:  February 20, 2010

12                              /s/ Jo McCall

13

14

15

16

17

18

19

20

21

22

23

24

25